**SUNDSTRAND CORPORATION,
Plaintiff-Appellee,**

v.

**SUN CHEMICAL CORPORATION et al.,
Defendants-Appellants.**

**Nos. 76–1316, 76–1317, 76–1318,
76–2058 and 76–2059.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 8, 1976

Decided Feb. 23, 1977.

As Modified on Denial of Rehearing and Rehearing En Banc in No. 76–1316 April 18, 1977 and in Nos. 76–1317–18 May 18, 1977.

Frank F. Fowle, Albert E. Jenner, Jr., Chicago, Ill., for defendants-appellants.

W. Donald McSweeney, William A. Montgomery, Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

These five appeals were consolidated and heard together. They arise out of an action brought by Sundstrand Corporation to secure redress for alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j) and SEC Rule 10b-5 (17 C.F.R § 240.10b–5) by Standard Kollsman Industries, Inc. (SKI),[1] John B. Huarisa,[2] and Henry W. Meers in connection with the transfer to Sundstrand of an option held by Huarisa to purchase stock of SKI. Sundstrand sought a rescission of the transfer or the assessment of damages against the defendants. The case was first tried without a jury from September 21 to December 8, 1971. At the close of Sundstrand's case, the district judge granted the defendants' motions to dismiss under Rule 41(b) of the Federal Rules of Civil Procedure. On Sundstrand's motion, he also dismissed Huarisa's counterclaim against Sundstrand for specific performance, where Huarisa alleged that Sundstrand failed to honor a monetary obligation due Huarisa under the stock option transfer agreement between them. We reversed both dismissals and remanded for a new trial largely because the district judge had unduly limited the scope of Sundstrand's proof.

1. SKI was merged into Sun Chemical Corporation at the close of 1972. Consequently, the amended complaint named Sun Chemical Corporation as a defendant in lieu of SKI.

2. Huarisa died in May 1975 during the course of this litigation. His co-executors, Thomas B. Hart, Jr. and Raymond F. Ryan, were substituted as defendants in his stead.

*Sundstrand Corp. v. Standard Kollsman Industries, Inc.*, 488 F.2d 807 (7th Cir. 1973).

Another judge tried the case without a jury from September 16 to October 8, 1975, and rendered judgment against defendants for $6,287,190 (including prejudgment interest) plus costs and dismissed Huarisa's counterclaim. The judgment was accompanied by a 76-page unreported memorandum opinion containing numerous unsegregated findings of fact and conclusions of law. We of course accept the credibility findings therein. *Brennan v. Midwestern United Life Ins. Co.*, 417 F.2d 147, 149 (7th Cir. 1969), certiorari denied, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397. Appeal No. 76–1317 was brought by Sun Chemical and the co-executors of Huarisa's estate; appeal No. 76–1316 was brought by defendant Henry W. Meers; and appeal No. 76–1318 was brought by Huarisa's estate because of the dismissal of Huarisa's counterclaim. The remaining two appeals concern costs in the district court. We affirm as to liability but the damages assessed below are modified.

The district court summarized the pleadings as follows:

"The transactions in dispute occurred on January 9, 1969, when Sundstrand, in connection with merger negotiations which were taking place between Sundstrand and SKI, transferred to Huarisa 5,686 shares of Sundstrand common stock, in exchange for the right to acquire a block of 223,190 shares of SKI common stock owned by the Burke family on which Huarisa had a right of first refusal; and on February 6, 1969, when Sundstrand paid $6,360,915 for that stock. The gravamen of Sundstrand's complaint is that Huarisa, Meers and SKI conspired to violate and did violate Rule 10b–5 by

misrepresenting material facts and failing to disclose material facts about the performance and financial condition of SKI during the merger negotiations which resulted in Sundstrand's purchase of the SKI stock. Huarisa has filed a counterclaim alleging that Sundstrand is obligated to repurchase from him the 5,686 shares of Sundstrand stock transferred to him." (Mem. op. 2.)

As might be expected in litigation which is completing its eighth year, the factual setting is complex. Prior to its merger into Sun Chemical on December 31, 1972, SKI was an Illinois corporation with places of business in Melrose Park, Illinois, and other parts of the United States. Its common stock was traded on the New York Stock Exchange, and 2,380,000 shares were outstanding during the pertinent period. SKI's financial reports to the stockholders and public usually consolidated the financial information for itself, Kollsman Instrument Corporation (KIC), and its other subsidiaries.

During the relevant period, Huarisa was chairman of the board and president of SKI. He owned 172,000 shares of its stock, which he had acquired at an average cost of $8.75 per share. He also had a right of first refusal on 223,190 shares of common stock owned by members of the family of James O. Burke, the late founder of Standard Kollsman. On January 8, 1969, he exercised that option by delivering to the Burke family his written election to purchase their shares, together with 5 per cent of the purchase price, namely, $334,785. On January 9, Sundstrand and Huarisa entered into a stock option transfer agreement which provided that Huarisa was selling the 223,190 shares of SKI stock to Sundstrand "subject to payment by Sundstrand of the unpaid balance of $6,360,915 due * * *."[3]

---

**3.** Huarisa could not exercise the option himself because of tax and securities problems best summarized by his brief:

"Sundstrand was told that under Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p(b) ), Huarisa's acquisition of 223,190 shares of SKI stock for $30.00 per share within six months of the 'sale' of his own 172,000 shares of SKI stock to Sund-

strand for $38.25 per share in Sundstrand stock would result in a forfeiture of the short-swing 'profit' represented by the difference between $30.00 and $38.25. The tax problem concerned the risk that any cash payment by Sundstrand to Huarisa (even mere reimbursement of his outlay to acquire the Burke stock) shortly before or after an otherwise tax-free merger between SKI and

At the same time, to reimburse Huarisa for his payment of 5 percent of the purchase price, Sundstrand agreed to convey 5,686 shares of its common stock to him. The actual transfer of those shares to Huarisa took place on March 3. On February 6, Sundstrand paid $6,360,915 for the Burke shares through an escrowee bank. The bank delivered them to Huarisa's agent, Hart, who turned them over to Sundstrand.

The stock option transfer agreement of January 9 was preceded by merger negotiations between Sundstrand and SKI commencing in November 1968. Meers, a managing partner of the Chicago office of White, Weld & Co., underwriter of securities and merger broker for corporations, was an outside director of SKI. He served as such from May 1967 to May 1970. In late spring or early summer of 1968, Meers recommended several companies, including Sundstrand, to Huarisa as good merger prospects for SKI. In mid-November 1968, at Huarisa's direction, Meers telephoned James Ethington, Sundstrand's president, to inquire as to his present interest in a merger.[4] Meers informed Ethington of SKI's 1967 earnings of $1.30 per share and its published earnings for the first nine months of 1968. Ethington told Meers that Sundstrand would be interested in merger discussions. During the ensuing November-December 1968 merger talks, Huarisa told Sundstrand's officers that SKI's earnings for the first three quarters of 1968 were 86¢ per share, in accordance with its published nine months' earnings statement.

On the afternoon of December 26, 1968, Ethington and Louis H. Schuette, vice chairman of Sundstrand, met with Meers to negotiate a price for Sundstrand's proposed acquisition of SKI. Meers was acting as an agent for Huarisa at the meeting and peri-odically called Huarisa about the price terms. After three hours of bargaining, Ethington and Schuette offered $38.25 per share for SKI's stock. This offer was accepted by Huarisa who agreed to submit it to his board of directors. On December 27, 1968, Ethington delivered a written proposal for Sundstrand to acquire SKI in exchange for Sundstrand's common stock at its market value, which was approximately equivalent to $38.25 for each share of SKI stock. On January 2, 1969, SKI's board of directors authorized Huarisa to proceed on the basis of Sundstrand's proposal, which was made public the same day. On January 7, officers and employees of Sundstrand began to survey SKI's operation in order to determine whether the merger should be consummated. On January 20, Sundstrand concluded to cancel the merger negotiations. The district court found that the reasons were as follows:

> "certain aspects of the SKI operation, including an increase in labor costs which a merger would cause, undesirable SKI labor practices, and lack of the expected compatibility of SKI's and Sundstrand's products, made the acquisition unattractive. The opinion was also expressed that SKI's earnings projects were somewhat optimistic [due in large part to SKI's heavy deferral of preproduction costs]." (Mem. op. 23–24.)

At a January 22 meeting with SKI officials and Meers, Sundstrand adhered to its decision to call off the merger negotiations, but Sundstrand president Ethington said that Sundstrand was going to honor "its commitment" of January 9 to Huarisa with respect to purchasing the Burke shares. The next day, the two companies announced that the merger plans had been dropped.

---

Sundstrand might be deemed to be taxable 'boot' to Huarisa under Section 356 of the Internal Revenue Code (26 U.S.C. § 356)." (Br. 14 n.*)

4. "Meers learned of Sundstrand's general interest in acquisitions and of its particular interest in SKI from Sundstrand. In early 1968, Meers met Ethington during the course of White, Weld's work on a Sundstrand underwriting, and Ethington told Meers that Sundstrand was interested in acquisitions and invited Meers to bring suggestions to his attention. Then in September, 1968, an officer of United Controls discussed its interest in acquiring SKI with a White, Weld partner from Minneapolis, who promptly reported this to Meers." (Meers Opening Br. at 6.)

As already noted, on February 6, 1969, Sundstrand paid an escrowee the balance of $6,360,915 for the Burke family's 223,190 shares of SKI stock. Four days later, Sundstrand was looking for a purchaser for those shares. On March 21, Norman Alexander, president of Sun Chemical, telephoned Sundstrand president Ethington and said that Alexander had copies of adverse reports on SKI by James W. Burke, a dissatisfied SKI director, and Ernst & Ernst, his firm of certified public accountants. Ethington and Ross, secretary of Sundstrand, flew to New York the next day to read those reports which questioned as of May 1968 the propriety of SKI's continued deferral of preproduction costs and the failure to recognize losses on some of the contracts which ultimately resulted in a net loss of 15¢ per share in SKI's report for 1968 published on March 21, 1969. After learning of SKI's financial results for 1968 and of the Burke and Ernst & Ernst reports, Sundstrand again tried unsuccessfully to dispose of its SKI stock and demanded rescission in July 1969. When rescission was refused, Sundstrand filed this action on August 9, 1969. In December 1975, Sundstrand sold its SKI stock, which had been converted into Sun Chemical stock through the December 1972 merger of the two companies, for an undisclosed sum.

## I. Liability Standard for Huarisa and Sun Chemical

In considering the liability of Huarisa, the district court concluded that

"he deliberately, or, at best, recklessly, misrepresented SKI's nine months' earnings, SKI's earnings for 1968 and for 1969, the interest of other companies in acquiring SKI at a price of $45 and the amount of potential write-offs of deferred preproduction costs for 1968. Huarisa also deliberately, or recklessly, failed to disclose the existence of the Burke and Ernst & Ernst reports, the Price Waterhouse memorandum of January 27, 1969, and the need for write-offs because of losses on contracts at year-end 1968." (Mem. op. 65.)[5]

The court added that Huarisa conspired with SKI and other officers, particularly Messrs. Ryan and Werle,[6] in making these misrepresentations, and that the misrepresentations of SKI personnel made during Sundstrand's January 1969 survey of SKI and during the Sundstrand-SKI meeting on January 22 were also made intentionally or recklessly. Besides being liable as a co-conspirator, Huarisa was held liable because he was a "controlling person" of SKI within Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)). His executors do not contest that he was a controlling person (Sundstrand Br. 23, n. *).

In employing the intentional or reckless test with respect to Huarisa's and other SKI employees' conduct, the district court acted correctly. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, the Supreme Court held that a private cause for damages would not lie under Section 10b and Rule 10b–5 in the absence of an intent to deceive or manipulate on the defendant's part. Sundstrand's amended complaint alleged both fraud and deceit, and the intent standard of *Hochfelder* was employed by the court below in passing on Huarisa's liability. It is true that in *Hochfelder* the Supreme Court did not decide whether reckless behavior is sufficient for civil liability under Section 10(b) and Rule 10b–5, although it recognized that recklessness is sometimes considered a form of intentional conduct for purposes of imposing liability for some acts. 425 U.S. at

---

**5.** The Price Waterhouse memorandum of January 27, 1969, stated its preliminary assessment that write-offs in the range of $3 million to $4.5 million would have to be made on the books of SKI's subsidiary, KIC, as of year-end 1968. Ultimately, adjustments of more than $4.6 million were charged on the books of that subsidiary as of year-end 1968.

**6.** Ryan was SKI's financial vice president and Werle was KIC's vice president-controller. They received the January 27 Price Waterhouse memorandum on February 3 and January 31, respectively.

194, n. 12, 96 S.Ct. 1375. Subsequently we held a corporation liable under Rule 10b–5 where, "blinded by conflict of interest," it "wantonly ignored" readily available evidence of the unfairness of a proposed acquisition and therefore failed to disclose certain facts to the other stockholders of the company it controlled and proposed to sell. *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 993–994 (7th Cir. 1976). This was akin to the alternative reckless standard employed by Judge Decker. See also *Lanz v. Drexel & Co.*, 479 F.2d 1277, 1306 (2d Cir. 1973) (*en banc*); cf. *Bonner v. Coughlin*, 545 F.2d 565, 567–569 (7th Cir. 1976) (*en banc*); *Kimbrough v. O'Neil*, 545 F.2d 1059, 1061 (7th Cir. 1976) (*en banc*). Therefore, there was no error in using the "reckless" alternative in assessing Huarisa's liability as his counsel seems to concede.

Sun Chemical does not contest that it is liable as the successor to SKI if Huarisa, Ryan, Werle and other SKI personnel violated Rule 10b–5, as the court found.

▮▮▮ To escape liability, Huarisa and Sun Chemical assert that Sundstrand is barred from recovery by its failure to exercise due care or diligence. However, that defense is not available in an intentional fraud case. *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir. 1976) (*en banc*) As will be seen, Sundstrand has amply shown reliance on Huarisa's and SKI's misrepresentations and omissions when entering into the January 9 agreement, and that its reliance was then justified. Under *Holdsworth*, that is sufficient to establish a causal connection between the misrepresentations and omissions and Sundstrand's injury. Therefore, the judgment below is affirmed insofar as it imposes liability on Huarisa and Sun Chemical for causing Sundstrand to enter into the stock option transfer agreement of January 9.

### A. Misrepresentations and Failures to Disclose by Huarisa and SKI

▮▮▮ For Huarisa and Sun Chemical to be liable under Rule 10b–5, their statements must have contained material misrepresentations or they must have omitted to state material facts. The most recent test of materiality under the Securities Exchange Act of 1934 is whether "there is a substantial likelihood that a reasonable [investor] would consider [the omitted facts or misrepresentations] important in deciding" whether to invest. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757; *S. D. Cohn & Co. v. Woolf*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181. Applying this test, we believe the following misrepresentations and omissions were material and that Sundstrand relied thereon.[7]

As to 1968, Huarisa represented to Sundstrand that SKI would earn $2.6 million or $2.9 million, and $1.16 per share, whereas it lost $367,803, or 15¢ per share. Like the court below, we remain unconvinced that these projections were reasonable because Huarisa and Ryan knew of SKI's production and financial difficulties and of the distinct possibility of large write-offs having to be made at the end of that year.[8]

The projection of $2.13 to $2.50 per share earnings for 1969 was also overstated, for the actual 1969 earnings were only 35¢ per share. Defendants have not convinced us that the 1969 projections were reasonable. Again, we agree with the district court that Huarisa and SKI knew, or were reckless in not knowing, that the 1969 earnings were grossly inflated. The pre-merger misrepresentations about SKI's earnings projections for 1968 and 1969 were continued by Huarisa and Ryan at the January 22 meeting when they endeavored to persuade Sundstrand to revoke its decision not to proceed

---

7. Huarisa and Sun Chemical concede that if material misstatements and omissions were propagated, Sundstrand properly relied upon them in entering the January 9, 1969, stock option agreement (Br. 45; Rep. Br. 14).

8. The district court devoted approximately 15 pages of careful analysis to demonstrate why SKI's earnings report for the nine months ended September 30, 1968, was false and misleading. Defendants have not satisfied us that this analysis was substantially inaccurate.

with the merger. However, nothing said by Huarisa and Ryan on January 22 could have influenced Sundstrand to proceed with the February 6 purchase of the Burke shares, for by then Sundstrand had received enough adverse information about SKI to call off the merger and to cause Sundstrand officers to divest themselves of the bulk of their SKI shares.

Huarisa and other SKI personnel also failed to disclose to Sundstrand that dissident SKI director James W. Burke filed a May 1968 report with the SKI board of directors questioning its accounting practices for 1967, particularly with respect to continuing to defer certain preproduction costs. Burke filed a supporting report from the accounting firm of Ernst & Ernst. These reports were discussed by the SKI's board at 25 board meetings during 1968, and representatives of Price Waterhouse, SKI's accounting firm, also discussed Burke's questions at several board meetings. Because of Burke's report, commencing in April 1968, the board received monthly financial reports showing the continual increase of deferred preproduction costs on certain SKI programs. In view of Burke's complaints to the SEC, SKI sent a Price Waterhouse partner and one of SKI's lawyers to discuss Burke's charges with the SEC, where it was concluded that the 1967 annual report did not reflect improper accounting practices. However, the Price Waterhouse firm assured the SEC that it would re-evaluate the situation when the 1968 annual report was prepared. The materiality of the nondisclosure of these reports is apparent, for SKI's board and Price Waterhouse representatives devoted major attention to them during 1968, and they certainly were a factor in causing Price

Waterhouse to insist that SKI could not continue to defer preproduction costs in 1968. As a reviewing court, we are bound by the district judge's credibility determination that Sundstrand's president Ethington was influenced by the nondisclosure of these critical reports. This was supported by his and Sundstrand's secretary's March 22 flight to New York just after the president of Sun Chemical informed them of the reports.[9]

On January 27, 1969, Price Waterhouse completed a memorandum stating its preliminary assessment that write-offs ranging from $3 million to $4.5 million would have to be made on the books of KIC for the year 1968. KIC's vice president-controller Werle admittedly received a copy of this report on January 31, and SKI's financial vice president and treasurer Ryan admittedly received it on February 3. The district court found that Huarisa also must have known of this Price Waterhouse assessment before February 6 when Sundstrand paid the $6,360,915 balance for the 223,190 Burke shares of SKI stock. This memorandum was obviously material, for it resulted in $4.6 million being charged on the KIC books in 1968, causing SKI to lose 15¢ per share. The memorandum should have been disclosed to Sundstrand, for it contradicted previous representations made by SKI personnel and certainly would have affected any reasonable investor's decision to proceed with a purchase of the magnitude involved on February 6.[10] But having been prepared so late, it of course could not have influenced Sundstrand to execute or reject the January 9 stock option transfer agreement. Its nondisclosure did not motivate Sundstrand in making its February 6 payment for the Burke shares because we

---

9. Although the district judge stated in an earlier portion of his opinion that it was unnecessary to resolve any conflict between the testimony of Ethington and of Huarisa and one of SKI's lawyers with respect to disclosure of the Burke and Ernst & E--st reports (mem. op. 35), he finally concluded that Huarisa had failed to disclose the existence of the Burke and Ernst & Ernst reports (mem. op. 65).

10. In its opinion, the district court also found that Huarisa and SKI made other false and misleading statements pertaining to the profitability of KIC's Avionics Division and to writeoffs which were in fact made at the end of 1968 (mem. op. 8, 17, 20 and 55–60). We will not discuss these matters in view of the more significant misrepresentations and omissions already discussed.

find Sundstrand had sufficient adverse information by then as to SKI.

Thus a number of material misstatements and omissions were made by Huarisa and SKI upon which Sundstrand relied. Whether or not this reliance was justified for purposes of damage causation, we defer to a later discussion in this opinion. However, in order to assess damage causation intelligently, it is necessary to study Sundstrand's obligation to purchase the Burke stock in greater detail.

### B. *Obligation of Sundstrand to Purchase Burke Stock*

█ In the court below, Sundstrand contended that it purchased the Burke family stock on January 9 and was obligated by its written agreement of that date with Huarisa to complete the payment therefor. We agree with the district court that the January 9 agreement between Sundstrand and Huarisa did not obligate Sundstrand to complete the purchase of Burke stock. Paragraph 2 of that agreement did require Sundstrand to convey 5,686 shares of Sundstrand stock to Huarisa to reimburse him for the $334,785 which he had paid the Burkes when he exercised his option to purchase their stock at $30 per share on January 8. In order to determine Sundstrand's liability under the January 9 contract, it is necessary to consider also the December 7, 1968, Burke family's written offer to sell 223,190 common shares of SKI stock to Huarisa at $30 per share and the pooling agreement referred to therein. The pooling agreement between the Burke family and Huarisa was dated February 23, 1967. It and the offer to sell gave John B. Huarisa the right of first refusal to purchase the Burke shares for 30 days after December 10, 1968,[11] by paying the Burkes $334,785 (5 per cent of the complete purchase price) at the time of his election to purchase. This deadline was January 9, and Huarisa satisfied this clause on January 8, 1969. Under the pooling agreement, if he wished to complete the purchase, he had until February 9 to pay an additional 20 per cent and until April 9 to pay the final 75 per cent. The pooling agreement provided that Huarisa would forfeit his right to purchase the 223,-190 shares of SKI in the hands of the Burke family if he failed to make any payment when due, with any prior payment being forfeited as liquidated damages. Since the agreement of January 9 between Sundstrand and Huarisa did not bind Sundstrand to pay the unpaid balance of $6,360,915, the agreement remained an offer to sell until Sundstrand should elect to purchase all the shares. Consequently, if Sundstrand did not choose to make additional payments on February 9, it would forfeit only the 5,686 Sundstrand shares that it agreed to convey to Huarisa to reimburse him for his initial payment of $334,785 (which was 5 per cent of the purchase price specified in the offer to sell and the pooling agreement). In *Sundstrand I* we characterized this transaction as follows:

"Taking this cue [that otherwise Sun Chemical would purchase the Burke shares and thus impede any SKI-Sundstrand merger], Sundstrand expressed a willingness to purchase Huarisa's rights to the Burke stock and to issue shares in Sundstrand to reimburse Huarisa for his payment of funds due the Burkes within three days. Huarisa accepted this offer. On January 8, he paid the Burkes sufficient funds to hold open his right of first refusal, and executed an agreement with Sundstrand the next day, conveying his purchase rights in return for reimbursement of the [$334,785] monies paid the Burkes.

"On February 6, 1969, more than two weeks after it had rejected the possibility of merger with SKI, Sundstrand paid the Burkes $6,360,915 and received the stock of SKI which Sun Chemical had earlier offered to purchase. Huarisa was repaid [the $334,785] on March 3, when Sund-

---

11. The offer to sell was received by Huarisa on December 10, and the 30-day option ran from that date.

strand transferred to him 5,686 shares of its common stock. By its agreement with Huarisa, Sundstrand was to repurchase the shares from him upon fifteen days' notice at any time within two years of the contract date." 488 F.2d at 810.

As Sundstrand has explained (Br. 15–16) and as the district court found (mem. op. 19), its reason for entering into the January 9 agreement with Huarisa was to prevent Sun Chemical from acquiring a block of SKI stock large enough to frustrate the proposed Sundstrand-SKI merger before Sundstrand could complete its study of SKI which commenced on January 7 and ended on January 20. Previously Sundstrand had been erroneously told by its counsel that the agreement of January 9 obligated it to buy the 223,190 shares, and accordingly it proceeded with the purchase on February 6. As a result, although Sundstrand's president told Huarisa on January 6 that Sundstrand would only be interested in buying the Burke stock if the proposed merger with SKI were to take place, on January 22, after the merger negotiations terminated, he told Huarisa that Sundstrand would honor "its commitment" of January 9 with respect to the Burke shares.

## II. Liability of Meers

Finally, we must consider whether Meers is also liable under Rule 10b–5 for the injury suffered by Sundstrand. The district court held him liable for three independent reasons: (1) failure to disclose the Burke and Ernst & Ernst reports even though he had a duty to do so; (2) as an aider and abettor of Huarisa and SKI; and (3) as a "controlling person" of SKI under Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t(a)). We reach only the first ground.

*Nondisclosure of the Burke and Ernst & Ernst Reports*

### A. Duty to Disclose

■ As the district court phrased it. Meers was "on both sides and in the middle of the transaction" (mem. op. at 68). Meers was an SKI director and was also acting as a merger broker for SKI and Huarisa with respect to Sundstrand. His firm was to receive a $150,000 fee if the merger with Sundstrand was completed. In the past, his firm had performed investment banking services for Sundstrand and its officials had confidence in him.[12]

Thus, although he was acting in a nominally adversary relationship vis-à-vis Sundstrand as SKI's merger broker, Sundstrand could properly rely on its preexisting and contemporaneous banker-client relationship with Meers for fair disclosure. In this posture as a quasi-fiduciary with respect to Sundstrand, Meers had an affirmative common law duty to disclose material facts relating to the proposed merger.[13] Haimoff, *Holmes Looks at Hochfelder and 10b–5*, 32 Bus.Law 147, 164–173 (1976) [hereinafter cited as Haimoff] and authorities cited therein. The district court therefore properly held that Meers had a duty to disclose the Burke and Ernst & Ernst reports during his pre-January 9 discussions with Sundstrand. See *Carr v. New York Stock Exchange*, 414 F.Supp. 1292, 1299–1300 (N.D.Calif.1976); cf. Jennings, *Insider Trading in Corporate Securities*, 62 Nw.U.L.Rev. 809, 818 (1968).

### B. Meers' Culpability in Omitting the Material Facts

After *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, a merely negligent breach of a duty defendant owes plaintiff is not sufficient to trigger liability under Section 10(b) of the Se-

**12.** In 1968, Meers' investment banking firm, White, Weld & Company, served as co-managing underwriter of a public offering by Sundstrand with Meers personally performing services in connection with the offering. Farwell Smith, a partner in White, Weld, worked under Meers on this underwriting and continued thereafter to make regular business calls on

Sundstrand until March 1969 when the revelation of the existence of the Burke and Ernst & Ernst reports terminated the relationship.

**13.** In contrast, Ernst & Ernst did not owe a common law duty to the plaintiffs in *Hochfelder*. 425 U.S. at 192 n. 9, 96 S.Ct. 1375.

curities Exchange Act of 1934 as implemented by Rule 10b–5. The opinion below, authored without the benefit of *Hochfelder*, did not make a finding on whether Meers acted with *scienter* or recklessly in failing to disclose the Burke and Ernst & Ernst reports because under pre-*Hochfelder* law in this Circuit the breach of an affirmative duty was actionable without more. *Hochfelder v. Midwest Stock Exchange*, 503 F.2d 364, 368 (7th Cir. 1974), certiorari denied, 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114. Under a negligence Rule 10b–5 standard, a description of the character of the conscious attention the defendant gave his breach of duty was wholly unnecessary. Therefore, unless we can conclude that the level of conscious attention Meers gave to the breach of his duty meets as a matter of law the *scienter* requirement of *Hochfelder*, or the reckless requirement of other cases, we would have to remand for a factual finding on this issue.[14] Since we find recklessness present, there is no need for a remand.

As noted above in our discussion of Huarisa's and Sun Chemical's liability, *Bailey v. Meister Brau, Inc.*, 535 F.2d 982 (7th Cir. 1976), resolved for this Circuit the ambiguity in footnote 12 of *Hochfelder* in favor of including reckless behavior in the definition of what behavior is necessary to maintain a Rule 10b–5 action. However, Meers' conduct comprised reckless nondisclosure rather than disclosing information with a reckless disregard for the truth of the material asserted. Thus a more extended analysis of the reckless behavior standard is required in our discussion of Meers' liability.[15]

■ At common law reckless behavior was sufficient to support causes of action sounding in fraud or deceit. Since there is no hint in *Hochfelder* that the Court intended a radical departure from accepted Rule 10b–5 principles,[16] it would be highly inappropriate to construe the Rule 10b–5 remedy to be more restrictive in substantive scope than its common law analogs.[17] *McLean v. Alexander*, 420 F.Supp. 1057, 1080–1082 (D.Del.1976). See generally, Haimoff, *supra*, at 154–156. Therefore, we hold that a reckless omission of material facts upon which the plaintiff put justifiable reliance in connection with a sale or purchase of securities is actionable under Section 10(b) as fleshed out by Rule 10b–5. See *Coleco Industries, Inc. v. Berman*, 423 F.Supp. 275 (E.D.Penn.1976); *SEC v.*

14. Cf. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757:

"Only if the established omissions are 'so obviously important to an investor that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment."

15. Rule 10b–5 actions have proved to be an idiosyncratic element of the law since in these cases the difficult problems presented have been in the formulation of the governing principles of law rather than the more common legal problem of application of settled principles of law to particular facts. Haimoff, *supra*, at 147. Indeed *Hochfelder* itself left open, in addition to the reckless behavior question, whether aiding and abetting was a proper Rule 10b–5 theory, and if so what its elements were, as well as whether *scienter* was required in a Rule 10b–5 injunctive proceeding brought by the SEC. 425 U.S. at 191 n. 7 and 194 n. 12, 96 S.Ct. 1375.

Therefore, we will only reach the reckless nondisclosure question in this case since the other two theories of liability discussed below—aiding and abetting and control person— would require us to face the difficult task of defining the elements of these theories after *Hochfelder*. We leave this task to another day.

16. While three Circuits held that negligence could support Rule 10b–5 actions before *Hochfelder*, there has not been any inter-Circuit controversy that *scienter* short of specific intent to defraud is sufficient to support liability. *McLean v. Alexander*, 420 F.Supp. 1057, 1081 n. 123 (D.Del.1976).

17. After setting forth the legislative history of Section 10(b) which indicated that Congress intended a good faith defense to 10(b) liability, the Court in *Hochfelder* stated:

"there is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith. The catchall provision of § 10(b) should be interpreted no more broadly." 425 U.S. at 206, 96 S.Ct. at 1387.

But by the same token, there is no justification for construing Section 10(b) more narrowly in light of the fact that good faith is not appropriate as a defense to reckless or intentional behavior. *McLean v. Alexander*, 420 F.Supp. at 1081.

*Bausch & Lomb, Inc.*, 420 F.Supp. 1226, 1242–1244 n. 4 (S.D.N.Y.1976).

Apparently the only post-*Hochfelder* reported definition of recklessness in the context of omissions appears in *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D.Okl.1976):

> "reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

As the Supreme Court conceded in *Hochfelder*:

> "In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." 425 U.S. at 193–194 n. 12, 96 S.Ct. at 1381.

The *Franke* definition of recklessness is "the kind of recklessness that is equivalent to wilful fraud". *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 868 (2d Cir. 1968) (Friendly, J., concurring) (en banc), certiorari denied *sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756.[18]

Indeed, the *Franke* definition of recklessness should be viewed as the functional equivalent of intent. Cf. Bucklo *Scienter and Rule 10b–5*, 67 Nw.U.L.Rev. 562, 570–571 (1972). Under this definition, the danger of misleading buyers must be actually

known or so obvious that any reasonable man would be legally bound as knowing,[19] and the omission must derive from something more egregious than even "white heart/empty head" good faith.[20] While this definition might not be the conceptual equivalent of intent as a matter of general philosophy, it does serve as a proper legally functional equivalent for intent, because it measures conduct against an external standard which, under the circumstances of a given case, results in the conclusion that the reckless man should bear the risk of his omission.[21] See O. Holmes, The Common Law 130–163; Haimoff, *supra, passim*; Ruder, Texas Gulf Sulphur—*The Second Round: Privity and State of Mind in Rule 10b–5 Purchase and Sale Cases*, 63 Nw.U.L. Rev. 423, 436–437, 441–442, 444 n. 107 (1968). See also *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1306 n. 98 (2d Cir. 1973) (en banc); *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 407–408 (3d Cir. 1974). When measured against this external standard, it may be said that such a reckless man has "use[d] or employ[ed] [a] deceptive device" within Section 10(b).[22]

*Application of the Recklessness Standard to Meers' Conduct*

**1. The Objective Element**

■ At the December 26 merger negotiation meeting, Meers agreed with Ethington that Ethington's earnings estimates for SKI of $1.16 per share in 1968 and $2.00[23] per share in 1969 were reasonable. Although there is conflicting evidence on whether

**18.** As Judge Friendly has succinctly stated, "[s]ilence when there is a duty to speak can itself be a fraud." 401 F.2d 833, 865.

**19.** This is an objective test although the circumstances must be viewed in their contemporaneous configuration rather than in the blazing light of hindsight.

**20.** This is a subjective test with the requirement of something more than "inexcusable negligence" imposed because of *Hochfelder*, 425 U.S. at 190 n. 5, 96 S.Ct. 1375. Thus if a trial judge found, for example, that a defendant genuinely forgot to disclose information or that it never came to his mind, etc., this prong of the *Franke* test would defeat a finding of reck-

lessness even though the proverbial "reasonable man" would never have forgotten.

**21.** Moreover, we note this standard of reckless behavior will not significantly broaden the class of plaintiffs who may seek to impose liability upon experts who perform services or express opinions with regard to matters under the Securities Exchange Act of 1934. Cf. *Hochfelder*, 425 U.S. at 214 n. 33, 96 S.Ct. 1375.

**22.** See Note, The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 255–260.

**23.** This figure was discounted by Ethington's skepticism from Huarisa's more optimistic representations of $2.13 to $2.41 for 1969.

Meers confirmed these earnings figures as reasonable, we cannot say that the trial court's credibility determination in Ethington's favor was clearly erroneous.[24] Since Sundstrand was primarily concerned that the proposed merger not result in an earnings dilution, the reliability of SKI's earnings projections was, of course, most important to Sundstrand and, as the district court realized (mem. op. 12), it stretches credulity to believe that SKI's earnings were not discussed. Given the importance of the earnings projection, the danger of misleading Sundstrand (as of December 26, 1968) was high when information—the Burke and Ernst & Ernst reports—that the earnings estimates might be significantly overstated due to accounting gimmickry was kept from Sunstrand's officers.

Meers denies actual knowledge of the danger, and the trial court made no determination that Meers possessed actual knowledge. However, a finding on the objective obviousness of the danger was made (mem. op. 32–34), which is sufficient for liability even absent an actual appreciation by Meers of the significance of the omitted material to Sundstrand.

The factual findings of the district court relevant to the obviousness of the danger, which upon our independent examination of the record we find amply supported, are most succinctly stated in the trial court's own words (mem. op. 32–34):

"[Meers] failed to disclose to Sunstrand that James W. Burke, a director, officer and large shareholder of SKI had, in May, 1968, formally submitted to the board of directors of SKI questions as to the propriety of certain SKI accounting practices, including that of continuing to defer certain preproduction costs on the CPU–46 and other programs. The ques-

tions related principally to accounting practices as revealed in the 1967 annual report. Burke supported his questions in June with a report from Ernst & Ernst, an independent firm of certified public accountants which Burke had asked to consider the propriety of the practices he challenged. Ernst & Ernst, though declining to render a formal opinion because it had not conducted an examination in conformity with generally accepted auditing procedures, concluded that the practices addressed in the Burke Report seemed questionable.

"These reports were considered serious enough by the SKI board of directors to be discussed at at least twenty-five board meetings during the spring and summer of 1968. The board directed the officers of SKI to prepare responses to Burke's questions, and at Meers' request, representatives of Price Waterhouse, the firm of certified public accountants which prepared the SKI 1967 annual report, appeared at several of these meetings to discuss Burke's questions. The board eventually decided that Burke's criticisms were without merit. However, as a result of Burke's questions, the board began, in April, 1968, to receive monthly financial reports. These reports revealed the continual increase of deferred preproduction costs on the CPU–46 and other programs throughout 1968. Meers was concerned enough to ask about the progress of each of the contracts on which costs were deferred, including the CPU–46, at every board meeting and asked particularly whether the CPU–46 had been qualified with the government—a step which was essential to producing an acceptable product and obtaining follow-on contracts. In each such

24. Meers testified that there was no discussion of projected earnings for either 1968 or 1969. Ethington claimed Meers confirmed the reasonableness of the figures Huarisa had given Ethington after Ethington told Meers what Huarisa's estimates were. Schuette's testimony—his deposition in his absence at trial—is neutral on whether Meers confirmed the figures as being reasonable. However, Schuette's testimony does demonstrate the importance of the earnings figure in Sundstrand's merger proposal. (Schuette Dep. 101–111.) Contrary to Meers' counsel's protestations, Ethington's deposition does not impeach, but rather strongly affirms, the conclusion that Meers passed on the reasonableness of the 1969 earnings projections in the December 26 meeting. (Ethington Dep. 31–44.) At best, the Ethington deposition is simply silent on whether the 1968 earnings estimate was discussed.

meeting he learned that no such qualification had been obtained. (In fact, qualification was not obtained until September, 1969.)

"Dissatisfied with the board's action, Burke complained to the SEC. Ryan, Hart, acting as attorney for SKI, and H. Dudley Murphy, a partner of Price Waterhouse, met in Washington with Curtis A. Davies of the SEC to discuss Burke's charges. At that meeting it was concluded that the 1967 annual report did not reflect improper accounting practices. With respect to preproduction costs on the CPU–46, Murphy assured Davies that Price Waterhouse would re-evaluate the situation when they prepared the 1968 annual report. This assurance was reiterated in a letter from Murphy to Davies. Both Ryan and Meers saw copies of that letter. None of this was disclosed to Sundstrand.

"Neither was it disclosed that, because of questions about the propriety of SKI's 1967 financial statements, two directors of SKI, Burke and Perry Addleman, refused to sign a registration statement filed by SKI with the Securities and Exchange Commission in March, 1968. Meers later suggested that the registration statement be withdrawn, which was done in August, 1968. In addition, defendants failed to disclose to Sundstrand that Addleman also raised questions about the financial accounting of SKI."

The trial court concluded that "the materiality of the Burke and Ernst & Ernst reports is not open to serious question" (mem. op. 36).

Meers places heavy reliance on the SEC meeting of August 1968 as dispelling the doubts the Burke and Ernst & Ernst reports had raised in his mind. However, the 1968 accounting practices were not passed on in the SEC meeting. The monthly financial reports which Meers requested as a result of Burke's initial complaints continued to show an increase in deferred preproduction costs. At every board meeting Meers asked about the preproduction costs. Indeed, Meers found out that the computer unit CPU–46 had still not been qualified with the government, a condition precedent for additional government contracts for that product. Thus the principal expected source of revenue against which to amortize the mounting preproduction costs remained indefinite and unreliable. Under these circumstances, any reasonable man would be bound to know that the danger posed to Sundstrand by the serious conflict on SKI's accounting policy among its board members and two public accounting firms as to deferred preproduction costs had not been vitiated by the inconclusive August 1968 SEC meeting.

*2. The Subjective Standard*

■ Yet even if constructive knowledge of the danger to Sundstrand of omitting certain facts is imputed to Meers, an omission caused because Meers genuinely forgot about these facts would not be actionable, even if such an omission derived from inexcusable neglect. Cf. *SEC v. Bausch & Lomb*, 420 F.Supp. 1226, 1241–1244, nn. 3 & 4 (S.D.N.Y.1976). But we need not remand for a factual determination here since a subsequent pre-January 9 event removed Meers' omission from the putative realm of mere inexcusable neglect. At the January 2, 1969, board meeting to approve the Sundstrand merger proposal, in Meers' presence Burke asked if Sundstrand had been told of the Burke and Ernst & Ernst reports and Huarisa replied that it had not. Therefore, rather than putting the question out of his mind, Meers must have consciously decided not to disclose (and did not disclose) [25] the substance of the reports to

---

25. Meers claims that Sundstrand had been informed of the Burke and Ernst & Ernst reports on January 6, 1969. On this (as on most of the important factual elements of this case) there is a dispute in testimony. The trial judge resolved the dispute as follows:

"Thus, even if the defendants' witnesses are believed, any disclosure of the Burke and Ernst & Ernst reports on January 6, 1969, was made in a false and misleading manner and did not inform Sundstrand of the material facts" (mem. op. at 35–36).
Cf. note 9 *supra*.

Sundstrand.[26] Thus recklessness is established as a matter of law by the facts found by the trial court. *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 993–994 (7th Cir. 1976).

### C. Remaining Elements of the Cause of Action

██ Since the omitted facts pass the stringent objective element of the recklessness test, the district court's determination of the materiality of the Burke and Ernst & Ernst reports—that there is a substantial likelihood they would be considered important by a reasonable investor—is not open to argument, especially since materiality assessments are peculiarly for the trial court as fact-finder.[27] *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757.[28] With materiality established, reliance in an omissions case is presumed. *Affiliated Utes Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741.[29]

Of course, Sundstrand would be open to a defense of non-reliance on the omissions if Meers could meet the burden of proof running against him to establish such an affirmative defense. *McLean v. Alexander*, 420 F.Supp. 1057, 1077–1079 (D.Del.1976).

Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5*, 88 Harv.L. Rev. 584, 606 (1975); Wheeler, *Plaintiff's Duty of Due Care Under Rule 10b–5: An Implied Defense to an Implied Remedy*, 70 Nw.U.L.Rev. 561 (1975); Note, *Reliance Under Rule 10b–5: Is the "Reasonable Investor" Reasonable?*, 72 Colum.L.Rev. 562, 567 (1972). In a nondisclosure case, reliance is vitiated if the plaintiff is chargeable with the omitted information. Under a negligence standard of liability, plaintiff could not justifiably claim reliance if he had not exercised due diligence. Wheeler, *supra.* But under a reckless or *Hochfelder scienter* standard, "[i]f contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant." *Holdsworth v. Strong*, 545 F.2d 687, 693 (10th Cir. 1976); cf. *McLean v. Alexander*, 420 F.Supp. 1057, 1078 (D.Del.1976).

We find nothing in the record that remotely suggests that Sundstrand was recklessly remiss in not ferreting out on its own the information contained in the Burke and Ernst & Ernst reports before its down payment to Huarisa on January 9, 1969 (mem. op. at 60–61). Rather, the record clearly

---

**26.** The board meeting took place at noon on January 2, 1969. In the morning, Ethington called Meers and inquired if he knew how a leak to the New York Stock Exchange about the proposed merger, causing the suspension of trading of SKI stock, had gotten out. Meers replied he did not know. Despite this recent contact with Ethington, Meers made no attempt to inform him of the Burke and Ernst & Ernst reports after the noon board meeting made clear that Sundstrand did not know of the reports' existence. (Tr. 124–125, 250, 646–649, 2206–2210.)

**27.** The legal character of the materiality concept has been recently explained by the Supreme Court:

"The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences

a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (footnotes omitted).

**28.** In this case, the alternative definition of materiality drawn in *Northway* is perhaps a more useful guide:

"Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 426 U.S. at 449, 96 S.Ct. at 2133 (footnote omitted).

**29.** As an objective indicium of Sundstrand's reliance on the "non-existence" as it were of the Burke and Ernst & Ernst reports, it should be recalled that Ethington and Ross rushed to Sun Chemical in New York in late March 1969 after learning Sun held copies of the reports. After digesting the reports, Ethington immediately berated Meers on his failure to disclose. (Mem. op. at 27, 35.)

suggests that if Meers had disclosed the reports, Sundstrand would not have executed the January 9 stock option transfer agreement with Huarisa which compelled it to transfer 5,686 of its shares to Huarisa in return for receiving his option to buy the Burke shares.[30]

■ Nor can Meers insulate himself from this liability by urging that he was only involved in the SKI-Sundstrand merger, for it is clear that the January 9 agreement was an integral part in any such merger by preventing Sun Chemical from purchasing the Burke shares "for another thirty days" (mem. op. 17–18), i.e., until February 9. Since Meers' conduct was partly responsible for Sundstrand's signing the stock option transfer agreement,[31] his nondisclosure was sufficiently "in connection with the purchase or sale of any security," as required by Rule 10b–5. *Eason v. General Motors Acceptance Corp.*, 490 F.2d 654 (7th Cir. 1973), certiorari denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312; *Heit v. Weitzen*, 402 F.2d 909, 912 (2d Cir. 1968), certiorari denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217.

It follows that Meers must share in the Huarisa estate's and Sun Chemical's liability on a material omission Rule 10b–5 theory. Therefore, we need not decide whether Meers would also be liable as an aider and abettor[32] or as a "controlling person" of SKI under 15 U.S.C. § 78t(a)—the alternative grounds purportedly establishing Meers' liability in the opinion below.

## III. Damage Causation for Purchase of SKI Stock on February 6

When the January 9 agreement was made between Sundstrand and Huarisa as to the Burke stock option, Huarisa's and SKI's intentional or reckless misrepresentations and omissions and Meers' reckless omissions had convinced Sundstrand that it should seriously consider merging with SKI. A prerequisite of the merger, viz., keeping the huge block of Burke stock out of Sun Chemical's hands, prompted Sundstrand to execute the agreement. However, as seen, that agreement only required Sundstrand to transfer 5,686 of its shares to Huarisa, which was accomplished on March 3. Sundstrand was not bound by the January 9 agreement to buy the Burke shares by paying the $6,360,915 balance on February 6 or later.[33] The record shows that the only reason Sundstrand completed the purchase was because its counsel (not the four lawyers who presented this lawsuit for Sundstrand) mistakenly told Ethington there was a legal obligation to do so.

We cannot accept the district judge's *sua sponte* suggestion that Sundstrand completed the transaction for investment purposes. During the January 7–20 survey period,

---

**30.** In hindsight, the reports may not have told more than Sundstrand already knew from its investigation of SKI. But the full Sundstrand investigative team did not compile its overall findings until January 20, 1969. And no subset of the team even preliminarily discussed findings until January 10. Thus in any event the omitted reports held substantial adverse information which was unknown to Sundstrand as of the stock option purchase on January 9.

**31.** Meers, although not present at the meeting where Sundstrand signed the agreement to purchase Huarisa's option on the Burke stock, was aware that Huarisa had a right of first refusal which had been triggered by Sun Chemical's offer for the Burke stock. Moreover, the trial court found that Meers had actual knowledge of Sundstrand's prospective purchase of the Burke stock prior to January 9 (mem. op. 15–16).

**32.** This question was left open in *Hochfelder*, 425 U.S. at 191–192 n. 7, 96 S.Ct. 1375. But compare *Hochfelder v. Midwest Stock Exchange*, 503 F.2d 364 (7th Cir. 1974), certiorari denied, 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114, with *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719 (W.D. Okl.1976). See also Note, *Hochfelder v. Ernst & Ernst—A Troublesome New Standard for Aiding and Abetting a Rule 10b–5 Violation*, 1 J. of Corp.L. 180 (1975).

**33.** The entire amount was paid on February 6, although the next installment payment was not due until February 9, because Sundstrand wanted to keep the matter as secret as possible from Sun Chemical and the Burke family to prevent subsequent litigation challenging a *de facto* assignment by Huarisa of his option right (Pitte Dep. 172–174).

Sundstrand had learned about SKI's faulty huge preproduction cost accounting. Its president, Ethington, had sold his 2000 shares of SKI stock on January 14 and its executive vice president, Sadler, sold 1000 shares on January 17.[34] The merger was called off on January 20 and Sundstrand tried to dispose of the Burke stock commencing February 10, thus belying any investment purpose. Sundstrand had been advised that such an investment would have been an improper use of corporate funds. The market price on February 7 was $5 less than the $30 per share Sundstrand paid for the Burke shares. Sundstrand would certainly not have paid a premium over market of some $1,000,000 if this purchase was an investment in SKI stock. Finally, being unregistered and therefore restricted, the Burke stock could only be sold by Sundstrand at a substantial discount below market. For these reasons, the investment theory advanced by Sundstrand for the first time in this Court simply will not wash. Our independent study of the record shows that the principal reason Sundstrand proceeded to purchase the Burke stock on February 6 was because counsel had wrongly advised Sundstrand officials that it was legally obligated to do so under the January 9 agreement with Huarisa.[35] Also Sundstrand had learned enough to apprise it that forfeiture of its down payment was better than further payments under that agreement.

**34.** Sadler sold his remaining 600 shares on February 13.

**35.** See Tr. 131, 165–167, 484–487, 625–631, 1703–1705, 2022–2023, 2420–2423, 2516–2519, 2620–2622, 2624–2627, 2635–2638 and the following depositions: Ethington 559, 565–571, 573–574, Olson 34–38, 40, 68–69, Huarisa 229–230, Pitte 96–97, 116–117, 167–168, 171–173, 180–181 and Schuette 304–305, 306–313. As we learned at oral argument no formal written opinion was submitted by Sundstrand's counsel as to whether Sundstrand was or was not obligated to make further payments on February 6 (Sun-Huarisa Exhibit 52). Some of these references are to the original transcripts of depositions that were included in the record on appeal without objection. Sundstrand has referred to such materials (Br. 77 and Pet. 10), and other courts of appeals have also referred

While Rule 10b–5 imposes "no obligation to pull back from a commitment previously made by the buyer and accepted by the seller because of after-acquired knowledge," it is true that for the purpose of damage assessment, "the time of a 'purchase or sale' of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another." *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972).[36] Much as in antitrust law, the ultimate goal of securities regulation is to achieve fundamental fairness in the marketplace. For antitrust, the prime aim is to avoid anti-competitive actions, while in securities law the focus is on controlling practices which smack of fraud. Pursuing this analogy, the Supreme Court's recent statement on damage causation in antitrust can be usefully paraphrased here:

> "Plaintiffs must prove [securities law] injury, which is to say injury of the type the [securities] laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the [fraudulent] effect either of the violation or of [fraudulent] acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations * * * would be likely to cause.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed. 2d 701.

to deposition transcripts which were in the record on appeal but not in the trial record. *E. g., Lyon v. Carey*, 533 F.2d 649, 652 (D.C.Cir. 1976); *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 170 (3d Cir. 1975); see also *Barrett v. Baylor*, 457 F.2d 119, 124 n. 2 (7th Cir. 1972).

**36.** Judge Waterman defined "commitment" in straight-forward terms:

> " 'Commitment' is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time."
> 464 F.2d at 891.

Because the January 9 agreement was entered into due to Huarisa's and SKI's intentional or reckless misrepresentations and omissions and Meers' reckless omissions, Sundstrand is entitled to recover only what that contract bound it to pay. As seen, that amount was $334,785. Since Sundstrand was not obligated to pay the additional $6,360,915 and did so only because of incorrect legal advice, reiterated here and in the court below, its recovery must be limited to $334,785 plus interest thereon. The incorrect legal advice, in conjunction with sufficient knowledge to show that forfeiture of its down payment was better than further payments, serves as the superseding cause which breaks the damage causation chain running to the defendants.

Sun Chemical and Huarisa contend that they are not liable even for this $334,785 because Sundstrand's obligation to pay this amount to Huarisa remained executory until March 3, 1969, when it transferred 5,686 of its shares to Huarisa pursuant to paragraph 2 of the January 9 agreement. However, Sundstrand had not learned of the Burke and Ernst & Ernst reports until March 21. In any event, the "commitment" occurred on January 9, 1969, under *Radiation Dynamics, Inc., supra,* at 891. Therefore, we cannot agree that its March 3 transfer to Huarisa was voluntary rather than on account of material misrepresentations and omissions. Because the record supports the district judge's findings that SKI's and Huarisa's misrepresentations and omissions were intentional or reckless and because Meers' omissions were reckless, Sundstrand is entitled to prejudgment interest on a judgment for $334,785 at the rate of 6% per annum from January 9, 1969, to the date of judgment in this Court.[37]

## IV. Dismissal of Huarisa's Counterclaim

The district court dismissed Huarisa's counterclaim under paragraph 4(a) of the January 9, 1969, stock option transfer agreement. Under that paragraph, Sundstrand agreed that it would purchase from Huarisa all or any part of its 5,686 shares transferred to Huarisa on March 3, 1969, for $58.75 per share on 15 days' written notice from Huarisa. He gave such notice on November 11, 1970, but Sundstrand rejected it on November 23, 1970, on the ground that Huarisa had violated the Securities Exchange Act of 1934 and SEC rules thereunder. The counterclaim sought specific performance or damages of $334,763.25 plus interest.

The reason given below for the dismissal of the counterclaim is that the agreement in question was made in violation of the Act and Rule 10b–5, so that it was void as regards the rights of Huarisa under Section 29(b) of the Act (15 U.S.C. § 78cc(b)) (mem. op. 76). This accords with our opinion in *Sundstrand I,* 488 F.2d at 816. The testimony of Messrs. Ethington, Schuette, Sadler and Ross was receivable under Rule 601 of the Federal Rules of Evidence and therefore not barred by the then current Illinois Dead Man's Act (Ill. Rev.Stat.1971 ch. 51, § 2).[38]

## V. Disposition

For the foregoing reasons, we affirm the judgment below as to liability. As to damages, the judgment is vacated with directions to enter judgment for plaintiff for $334,785 plus 6% interest from January 9, 1969, to date. Each party will bear its own costs on appeal. We affirm the district court's order of August 18, 1976, with respect to costs in that court.

---

**37.** We will not consider defendants' various attacks on the amount of interest since they were not raised below.

**38.** The trial court did not rely on any inadmissible evidence in its findings against Meers, nor do we. Meers' counsel has evidently abandoned its contention that portions of Sundstrand vice chairman's Schuette's deposition were inadmissible. At any rate, the point is without merit. See Rule 32(a)(3) of the Federal Rules of Civil Procedure and Rule 802 of the Federal Rules of Evidence. Indeed, in its notes to Rule 802, the Supreme Court's Advisory Committee on the Proposed Rules of Evidence expressly recognized the admissibility of depositions under Rule 32 of the Rules of Civil Procedure as a continuing independent exception to the hearsay rule. 28 U.S.C.A. Federal Rules of Evidence p. 573.

On petition for rehearing and rehearing en banc in No. 76–1316

On consideration of the petition for rehearing and suggestion for rehearing *en banc* filed in the above-entitled cause by defendant-appellant Henry W. Meers, no judge in active service has requested a vote thereon, and all judges on the original panel have voted to deny a rehearing. Accordingly,

IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.*

IT IS FURTHER ORDERED that the slip opinion be modified by the insertion of the following clause after "counsel" in the 20th line of page 1049:

"(not the four lawyers who presented this lawsuit for Sundstrand)" **

Judge Tone disqualified himself from consideration of this petition for rehearing.

### Nos. 76–1317, 1318

On consideration of the petition for rehearing and suggestion for rehearing *en banc* filed in the above-entitled cause by appellee Sundstrand Corporation, and on consideration of the answer thereto filed by appellants Sun Chemical Corporation and Huarisa Estate, a majority of the judges of the original panel have voted to deny a rehearing, and a majority of the judges in active service have voted to deny a rehearing *en banc*. Accordingly,

IT IS ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.***

IT IS FURTHER ORDERED that the following be added at the end of the last line of footnote 35 of the slip opinion:

"Some of these references are to the original transcripts of depositions that were included in the record on appeal without objection. Sundstrand has referred to such materials (Br. 77 and Pet. 10), and other courts of appeals have also referred to deposition transcripts which were in the record on appeal but not in the trial record. *E.g., Lyon v. Carey,* 533 F.2d 649, 652 [174 U.S.App.D.C. 422,] (1976); *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 170 (3d Cir. 1975); see also *Barrett v. Baylor,* 457 F.2d 119, 124 n. 2 (7th Cir. 1972)."

FAIRCHILD, C. J., voted for rehearing by the panel, BAUER, J., voted for rehearing *en banc,* and TONE, disqualified himself from consideration of the petition.

---

* For additional authorities, see *Santa Fe Industries, Inc. v. Green,* —— U.S. ——, ——-, 97 S.Ct. 1292, 51 L.Ed.2d 480; Bucklo; The Supreme Court Attempts to Define Scienter Under Rule 10b–5: *Ernst & Ernst v. Hochfelder,* 29 Stanford L.Rev. 213 (1977).

** Editors Note; This correction has been made in the text of the published opinion.

*** See *Santa Fe Industries, Inc. v. Green,* —— U.S. ——, ——, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480; *Piper v. Chris-Craft Industries, Inc.,* —— U.S. ——, ——, 97 S.Ct. 926, 953, 51 L.Ed.2d 124 (Blackmun, J., concurring).