### 653.   CENTRAL OF GEORGIA RAILWAY COMPANY *v.* COOK & LOCKETT.

1. The issuing of a bill of lading by a carrier is only prima facie evidence of the receipt of the goods. If the bill of lading is issued prior to the time the goods are tendered to the carrier, it does not become effective until the goods are offered to the carrier in such a condition as that it should receive them. )
2. Under the rules of the railroad commission, as well as by general law, no railroad company is required to accept for carriage any goods, unless they are tendered in such condition that the transportation thereof is safe and practicable. The tender of·a car-load of such commodities as, under the rules of the commission, are to be loaded by the shipper is not a good tender if the car is unsafe. )

Action on contract, from city court of Albany—Judge Crosland. June 22, 1907.

Argued November 12, 1907.—Decided September 28, 1908.

*Wooten & Hofmayer, Cruger Westbrook,* for plaintiff in error. *Mann & Milner,* contra. ·

RUSSELL, J.   Cook & Lockett recovered a verdict for $500, damages, against the Central of, Georgia Railway Company, for the non-delivery of a car-load of barrel staves. The railway company's motion for a new trial was overruled; and exception is taken to that judgment, as well as to certain anterior rulings to which objections were preserved by exceptions pendente lite. It appears from the evidence that Cook & Lockett, on October 6, 1906, obtained from an employee of the plaintiff in error, in the office of its agent at Albany, Georgia, a bill of lading for the transportation of a car-load of barrel staves from Albany to Century, Georgia, a station six miles from Albany, on the line of its railroad. The bill of lading was of standard form. This car-load of

staves had been brought to Albany from Lockett's mill by the Georgia Northern Railroad; and, at the time of the issuance of the bill of lading by the Central of Georgia Railway Company, the car containing the staves was at the yard and in the possession of the Georgia Northern Railroad Company. Cook & Lockett had paid to the Georgia Northern the freight from Lockett's mill to Albany, and the Georgia Northern had issued a trackage order for the delivery of the car to the Central of Georgia Railway. According to the evidence, a trackage order is issued by a railroad company to its yard-master to place a certain car on a siding or to deliver it to a connecting line. According to the evidence, Cook & Lockett being entitled to one "free movement" of the car after it arrived at its destination, the Georgia Northern was bound to deliver the car in question to the Central free of charge. The paid freight bill of the Georgia Northern was delivered to the agent of the Central at the time the bill of lading was issued, and the agent was informed by the shipper that the car was in the possession of the Georgia Northern, and an order had been issued for it to be delivered to the Central. So far as appears from the evidence, neither the shipper nor the agent of the Central had any knowledge or intimation that the car in possession of the Georgia Northern was in any other than good condition for shipment; and the evidence of the defendant's agent, that the plaintiff was informed by him, at the time the bill of lading was issued, that the car would go forward as soon as it was received from its connection, is not controverted. In other words, it is clear, from the evidence, that the car had not been accepted for shipment by the carrier at the time the bill of lading was issued. Evidence not disputed was introduced, showing the existence of a local custom at Albany, among the different railroads entering that city, under which, for the convenience of shippers, bills of lading are issued, even though the proposed shipment is in the possession of another railroad in the city, either upon proof that a trackage order has been issued by the delivering line upon whose tracks the car is supposed to be, or upon sufficient proof that a car has been ordered delivered to a receiving carrier. The existence of this custom is due to the fact that otherwise the shipper would have to go to the office of the receiving railroad perhaps more than once before the particular car for which he sought a

bill of lading had passed inspection and had been delivered. It appears, from the evidence, that the car in question was several times shifted upon the track which was usually used for delivery by the Georgia Northern to the Central, and each time it was rejected by the inspector acting in behalf of the Central, as being dangerous to life and property. The car was first marked or tagged as in bad order on October 4, and it was not shifted to the delivery track until October 11. At this time it had "condemnation." marked on it, and one end of the car was knocked out. After having been placed upon the transfer track on the 12th and 13th and refused by the Central, it appears to have been repaired by the Georgia Northern, so far as the end of the car was concerned; but when it was again shifted back on the transfer track, on the 15th and 16th, it was each time refused by the inspector, because the car had been knocked off the center plate, and, according to the testimony of the inspector, was in a more dangerous condition than when refused before. The evidence that at no time when the car was tendered to the Central Railway would the carriage of the car have been safe to human life and property was undisputed. The car was never accepted by the joint inspector, for carriage by the Central; it never left the Georgia Northern Railroad tracks or its posssession until October 17th, when, by the direction of the plaintiffs, it was placed by the Georgia Northern on its dray track and unloaded by the plaintiffs themselves. To rebut this testimony, the plaintiffs introduced evidence that the agent of the railroad more than once admitted that the car had been received and would be forwarded by the Central Railway. The plaintiffs testified that they went a number of times to the freight office to find out about the car, and each time were assured that it would go forward by the next train. One of the plaintiffs testified that the agent in the freight office said that the car had been received and accepted and would go forward by the next train. This statement was denied by the agent in question.

The plaintiffs claim damages for the delay and failure to deliver caused by the defendant company's breach of its contract, consisting of the following items: that they lost 100 barrels of crude turpentine, worth $500; that they were compelled to pay out to laborers, who were compelled to be idle by reason of the non-delivery of the staves, $375, and, for their expense in finally

hauling the staves from Albany to Century, $16, making a total of $891 of actual damages. The evidence disclosed that the still was closed for about six days, and that the plaintiffs bought 315 beer barrels in Albany, to replace the barrel staves; which it was estimated would make 450 barrels.

In our opinion, the verdict in favor of the plaintiffs was unwarranted, and the court erred in not granting a new trial upon the defendant's motion. It would subserve no useful purpose to discuss seriatim the very numerous exceptions contained in the motion for new trial. We may say, in passing, that none of the exceptions as to the amendments allowed by the court are meritorious. The greater number of the amendments offered were made in response to special demurrers, but the court did not err in allowing the amplification of the plaintiffs' petition, nor in allowing the damages claimed to be increased in the petition from $500 to $1,000.

The controlling question in the case is, was there a delivery of the freight to the defendant carrier? We think the plaintiffs failed to show that the staves in question were ever accepted by the carrier for shipment; and of course, that such was the case is an indispensable element in the case. It is true that a bill of lading in the standard form is introduced in evidence; but a bill of lading is not a contract of carriage; it is only prima facie evidence of the receipt of the goods. The bill of lading is subject to explanation, and when it is brought in question it may be shown that the goods described therein were not in fact received by the carrier. The evidence of the custom by which bills of lading are issued in Albany in advance of actual delivery is of comparatively little importance, because the evidence is undisputed that the car in question was in fact never accepted for shipment by the Central of Georgia Railway Company, and was never in proper condition to be received by it. The refusal to accept the car in the condition in which it was shown by the undisputed testimony to have been was justified by rule 26 of the railroad commission, as follows: "No railroad company shall be required to accept for carriage any goods, unless the same shall be of such character and in such condition and so prepared for shipment as to render the transportation thereof reasonably safe and practicable." The courts take judicial cognizance of these rules. The evidence is undisputed

that the condition of this car was such that its transportation was neither safe nor practicable. Had the shipment been less than a car-load the duty might have devolved' upon the Central of Georgia to unload the staves from the unsuitable car, but, under the rules of the railroad commission, car-load lots of barrel staves are to be loaded by the shipper, and, therefore, it was the duty either of the shippers themselves, or of the Georgia Northern Railroad, and not the duty of the Central of Georgia to have unloaded the contents of the wrecked car and to have loaded them into a safe car. We bear in mind that there was an issue as to whether the shipper was aware of the custom, and as to whether the custom attempted to be shown was more than purely local. But regardless of the issuance of the bill of lading, we think it clear that the railroad was not required, after it became aware of the condition of the car, to endanger life and property by attempting to transport it.          *Judgment reversed.*