15912.    CENTRAL OF GEORGIA RAILWAY COMPANY *v.* GRINER
& RUSTIN.

JENKINS, P. J. 1. Where shippers of live stock sued the carrier for damages on account of delay in transportation to the place of destination, and alleged loss in market value because the defendant had failed to move the car by its afternoon train on a certain day and until the arrival of its afternoon train on the following day, whereby the arrival at destination was delayed from Saturday to the following Monday, the court did not err in overruling a general demurrer to the petition, based chiefly upon the ground that the bill of lading provided that "no carrier is bound to transport said live stock by any particular train . . or in time for any particular market;" since the carrier was bound both by its general legal obligation (Civil Code of 1910, § 2773) and by an additional clause in the bill of lading to transport the shipment "with reasonable dispatch," and it was for the jury to say whether the delay alleged was unreasonable. *Flowers* v. *Ga. Northern Ry. Co.,* 32 *Ga. App.* 52 (122 S. E. 647); *So. Ry. Co.* v. *Bloch,* 18 *Ga. App.* 767 (1) (90 S. E. 656). Nor was the petition as amended subject to the special demurrers relating to the allegations of shrinkage in weight of the cattle during the shipment, and lack of proper care in feeding, watering, and looking after said stock, these being sufficiently set forth.

2. The verdict, finding for the plaintiffs in divisible items, "loss in weight

in cattle $47.78, decline in price in delay $91.70, decline in price hogs $22.50," total $161.98, was authorized under the evidence.

3. Since "the words 'immediate shipment' have been construed as equivalent to 'reasonable promptitude,' or 'within a reasonable time'" (*Columbia Smelting Works* v. *Dexter*, 31 *Ga. App.* 627, 121 S. E. 844), there was no error in charging the jury in effect that if they should find that the stock was accepted by the carrier "for immediate transportation, and they failed to transport in accordance with their contract," without sufficient reason for such failure to transport as agreed and in time, the verdict should be for the plaintiffs, the general legal obligation as well as the express requirement of the bill of lading being that the stock should be transported "with reasonable dispatch." However, in view of the general popular acceptation of the term "immediate," as importing swifter action than the terms "reasonable time" or "reasonable dispatch," it would have been more accurate to use one of the latter terms.

4. The finding for the plaintiff on account of shrinkage in weight being authorized under the evidence, the judge did not err in submitting in his charge such issue to the jury.

5. While it was not admissible to establish a special contract with the carrier (*Atlantic Coast Line R. Co.* v. *Wells*, 130 *Ga.* 55, 59, 60 S. E. 170), or to vary the terms of the bill of lading, there was no error in admitting, as bearing on the issue of unreasonable delay, the testimony of one of the plaintiffs, "Before buying the cattle and hogs, I went to the agent and asked him if it was possible to get them into Savannah for the next morning's market, and he told me it was," notwithstanding the bill of lading provided that the carrier need not transport by any particular train or for any particular market. "Whether or not the delay in delivery was unreasonable is a question for the jury, and to be determined by them on all the facts of the case;" and as a part of these facts they are authorized to consider "the information given by the shipper of peculiar reasons for a speedy transit and delivery." *Columbus Ry.* v. *Flournoy*, 75 *Ga.* 745, 746 (2); *So. Ry. Co.* v. *Bloch*, supra.

6. A clause in the bill of lading, signed by both the shippers and the carrier's agent, providing that it should be "subject to the classifications and tariffs in effect on the date of this agreement," it was error to exclude material portions of the published tariff and classification existing at the time of the shipment, requiring that "Live stock in less carloads if not tied, or in mixed carloads, must be separated by means of strong partitions to be erected by the shipper at his expense and risk as follows: each . . bull . . must be separated from other animals . . Animals of each kind must be separated from animals of each other kind."

7. Where, as here, under the contract of affreightment the shipper assumes the duty of loading a car of live stock at his own risk and subject to certain regulations contained in the bill of lading, requiring the separation of the hogs from the cattle, the carrier would not ordinarily be liable for damages incurred in transportation by reason of the failure on the part of the shipper to properly comply with the obligations which he has thus assumed. 10 Corpus Juris, 105. But even where the shipper is to do his own loading, the carrier who ac-

cepts the freight for shipment assumes the obligations and liabilities of a common carrier (1 Michie on Carriers, 758; 10 Corpus Juris, 106, and notes; 4 Elliott on Railroads, 310); and in the absence of a false representation or deceitful conduct on the part of the shipper with reference to the manner of loading, the carrier, on issuing its bill of lading for the goods as in apparent good order, is presumed to acquire knowledge of any patent fault or delinquency in the manner of loading which a casual inspection of the freight thus tendered would render apparent (*Central of Ga. Ry. Co.* v. *James*, 117 *Ga.* 832, 838, 45 S. E. 223; Kinnick *v.* Chicago Ry. Co., 69 Iowa, 665, 29 N. W. 772); and where a shipment has been improperly and defectively loaded by the shipper in a manner which would subject it to risks and dangers in transportation, the duty devolves upon the carrier to refrain from transporting it until after such patent defects and deficiencies have been remedied. (*Central of Ga. Ry. Co.* v. *Lockett*, 4 *Ga. App.* 698, 701, 702, 62 S. E. 464); and this is true regardless of the previous issuance of its bill of lading for the loaded goods as in apparent good order. In other words, the acceptance of freight loaded by the shipper and the issuance of a bill of lading therefor, even though it contains the provision that the goods are received "in apparent good order," does not impose upon the carrier the duty to transport the goods until they are in fact in a condition fit for transportation; and consequently the issuance of such a bill of lading does not operate as an absolute estoppel against the carrier, such as would prevent it from excusing a necessary delay in the movement of the freight occasioned by remedying the defects in the shippers work of loading. Accordingly, it was not a correct statement of the law to charge the jury in effect that the carrier would be unconditionally liable for damages incurred by the delay in the proper and necessary work of reloading the shipment, if it had issued its bill of lading for the goods as in good order without exercising proper diligence in inspecting.

8. The carrier might be liable, however, for the loss occasioned by unreasonable delay, where it is made to appear that the carrier has been guilty of negligence in failing to make its inspection upon the tender of the freight and prior to the issuance of its bill of lading accepting the goods as in apparent good order, when they were palpably improperly loaded, and where, if such patent defect had been then and there discovered, the defect could have been remedied in time to avoid any subsequent delay in the movement of the freight. In such a case, such negligence of the carrier might constitute the proximate cause of the subsequent delay in transportation. In the instant case this specific theory of liability, while sufficiently covered by the pleadings, was not contended for under the evidence adduced or dealt with in the charge of the court; and it can not be said that liability under this theory was indisputably shown so as to render harmless the erroneous excerpt from the charge actually given.

*Judgment reversed. Stephens and Bell, JJ., concur.*

Decided April 15, 1925.

Action for damages; from city court of Statesboro—Judge Proctor. August 20, 1924.

The shippers sued the carrier for damages on account of depreciation in market value from an alleged unreasonable delay in transporting certain cattle and hogs from Statesboro, Ga., to Savannah, Ga., and on account of shrinkage in weight from alleged lack of proper care in feeding, watering, and looking after the stock. The defense of the carrier, as set forth in its plea, was that the "plaintiffs loaded a car with different kinds of stock in one car, to wit, hogs and cows, there being one bull, and plaintiffs failed to separate by partitions or in any other way said different kinds of stock as aforesaid, and failed to tie said bull, as required by law and as required by the contract contained in the bill of lading, and if any damage resulted from said shipment it was due to plaintiffs' own carelessness and failure to comply with the law and the said contract of shipment." The bill of lading, signed by both the shippers and the carrier's agent, required that "the shipper at his own risk and expense shall load and unload the live stock into and out of cars, except in those instances where this duty is made obligatory upon the carrier by statute or is assumed by a lawful tariff provision," and also that the shipper "shall separate different kinds of live stock when loaded in the same car, by adequately strong partitions, and such stock shall be at the risk of the shipper as to any damage resulting from insufficiency or inadequacy of any such . . appliance or partition."

From the evidence it appears that the plaintiffs, about noon on a Friday, loaded in one car 57 hogs and 22 head of cattle, including a bull, without separating the kinds of animals or the bull from other animals, as required by the bill of lading and the published tariff. The stock was to be transported, for "immediate slaughter," from Statesboro to Savannah, a distance of about 60 miles. The carrier appears to have had only one train each day available for the transportation of live stock from Statesboro, leaving that place in the afternoon and arriving at Savannah about 11 o'clock at night. It was undisputed that the bill of lading, acknowledging receipt of the stock as "in apparent good order" for shipment, was prepared and delivered to the shippers by an authorized assistant of the carrier's agent; that immediately after receiving the paper they went to a near-by town; that neither the agent nor his assistant made any actual inspection of the car or observed the manner

of loading until about 30 minutes before the arrival of the Friday-afternoon train; that it was then too late to properly separate the animals before the arrival of this train; that the operators of this train refused to carry the car, because of the failure to separate the animals; that the carrier did not notify the shippers as to such refusal or advise them as to the improper loading until Friday afternoon after the departure of the train, when the agent demanded that they install partitions, and, upon their failure to do so, he himself had them provided; that the car of stock was then carried on the next Saturday-afternoon train, but did not reach Savannah until too late for the Saturday market, so that the animals were available only for the depreciated Monday market. There was evidence that, if the required lumber was at hand, it would have taken about an hour to provide partitions for the animals; but the evidence was not clear as to how near at hand such material was, or just how long the supplying of the lumber, the unloading of the stock, the building of the partitions, and the reloading, would have taken, if it had been attempted between the time of the issuance of the bill of lading soon after noon and the arrival of the Friday-afternoon train. The evidence was also not clear as to what animals were fed or when they were fed by the carrier after issuance of the bill of lading, but there was some evidence indicating that the only feeding was done on Friday; and the evidence as a whole authorized the verdict for the plaintiffs for the item claimed on account of shrinkage in weight.

The evidence was in dispute as to what was said and done between the shippers and the carrier's assistant agent before and at the time of the delivery of the bill of lading. One of the shippers testified that this agent stated to him that before he issued the bill of lading, "he would have to first examine the car," and "see" it, that the shippers then left the depot, returned half an hour later, received the bill of lading, and immediately went to another town, at which they received a telephone call from the agent, advising as to their failure to separate the animals and the refusal of the train crew, on this account, to take the car. The agent denied making any statement with reference to his proposed inspection before issuing the bill of lading. He testified also that when the shipper came to him for the paper, he asked the shipper "if the car was in condition to move," and that the shipper said "that

it had been loaded in such shape as that it was ready for movement." The shipper denied making such a statement, but testified that the agent asked him if the stock was "loaded," and "I told him 'yes,' it was loaded, ready to go."

The excerpt from the charge, referred to in the 7th and 8th divisions of the syllabus, is as follows: "If you find from the evidence in this case that the plaintiff loaded the stock, as contended for by the plaintiff, and that the defendant company issued a bill of lading therefor, and it was in apparent good order, the duty would be on them to see if the stock was properly loaded, or if they had opportunity to investigate and see if this stock was properly loaded and issued this bill of lading, or if they negligently failed to look and see if the car was properly loaded, and accepted the shipment without doing that, in that case the railroad would be bound, and your verdict in this case would be for the plaintiff, provided you find that the plaintiff has been endamaged in the way set out in his petition." The grounds of exception taken to this instruction are: (1) that it excluded from the consideration of the jury the right of the defendant to rely on the terms of the contract of affreightment; (2) that it excluded from consideration the obligation of the plaintiffs to load the stock properly by separating the cattle from the hogs in the manner required by the bill of lading; (3) that it instructed the jury that, if the carrier issued the bill of lading and the stock was in apparent good order, then it became the duty of the carrier to see that the stock was properly loaded, notwithstanding the terms of the contract entered into between the parties; (4) that it instructed the jury that, if the carrier had the opportunity to investigate the loading, and a bill of lading issued, then the plaintiffs should recover, notwithstanding by contract they assumed the obligation to properly load the stock and failed to do so.

*A. S. Bradley, Howell Cone,* for plaintiff in error.

*Lanier & Lanier,* contra.