**Nathan DWOSKIN et al., Plaintiffs–Appellants,**

v.

**ROLLINS, INC., Defendant–Appellee.**

No. 78–3655.

United States Court of Appeals, Fifth Circuit.

Jan. 16, 1981.

Gilbert H. Deitch, Gerald B. Kline, Atlanta, Ga., for plaintiffs–appellants.

Arnall, Golden & Gregory, Cleburne E. Gregory, Jr., William H. Kitchens, Atlanta, Ga., for defendant–appellee.

Before GEE and RANDALL, Circuit Judges, and LYNNE,* District Judge.

RANDALL, Circuit Judge:

In accordance with the terms of an Agreement and Plan of Reorganization dated as of November 28, 1967 (the "Agreement"), between the stockholders (the "Stockholders") of Dwoskin, Incorporated and Dwoskin Decorating Co. (collectively, the "Dwoskin Companies") and Rollins, Inc. ("Rollins"), Rollins acquired on January 1, 1968, all the outstanding capital stock of the Dwoskin Companies in exchange for a total of 40,000 shares of Convertible Preferred $3 Series, no par value (the "Preferred Stock"), of Rollins. The Agreement provided that the Preferred Stock was not subject to redemption during the five year period ended on January 1, 1973, but was subject to redemption thereafter, upon 30 days' notice to the Stockholders, at a price of $125 per share. The Agreement further provided that the Preferred Stock was convertible into Common Stock, $1 par value, of Rollins ("Common Stock") at any time after January 1, 1973, at the rate of 1.875 shares of Common Stock for each share of Preferred Stock, subject to certain adjustments and to specified limitations designed to impose, in effect, a floor of $5,000,000 and a ceiling of $7,000,000 upon the aggregate market value of the shares of Common Stock issuable upon conversion.

* Judge of the Northern District of Alabama, sitting by designation.

On January 3, 1973, Rollins gave 30 days' written notice to the Stockholders of its intention to redeem all the outstanding Preferred Stock at a price of $125 per share, but advised the Stockholders that they could convert each share of Preferred Stock into 7.03125 shares of Common Stock by surrendering the Preferred Stock for conversion in accordance with instructions in an enclosed letter of transmittal. The conversion ratio of 7.03125 specified in the notice of redemption was erroneous, however, because if such ratio had been applied, the market value of the Common Stock issued upon conversion would have substantially exceeded the $7,000,000 ceiling imposed by the Agreement. This fact was promptly called to the attention of the management of Rollins by one or more of the Stockholders, and on January 12, 1973, Rollins sent a letter to each of the Stockholders advising of the error and of the correct conversion rate—4.6449 shares of Common Stock for each share of Preferred Stock. During the period from January 17 through January 23, 1973, the Stockholders surrendered all the outstanding shares of Preferred Stock for conversion by sending the certificates evidencing such shares to the Bank of Delaware, the Transfer Agent for the Common Stock, as instructed by the letter of transmittal form furnished by Rollins.

Upon receipt of such certificates, the Transfer Agent for the Common Stock forwarded them to Rollins in Atlanta pursuant to instructions from an officer of Rollins; the certificates were then returned by Rollins to the Transfer Agent for issuance of the Common Stock upon conversion.

When the certificates were returned to the Transfer Agent in Delaware, yet another snag developed. The Transfer Agent discovered, and so notified Rollins, that Rollins had failed to list the Common Stock issuable upon conversion of the Preferred Stock on the New York Stock Exchange. Rollins filed a Supplemental Listing Application with the New York Stock Exchange on February 2, 1973, and the listing of the Common Stock was authorized by the Exchange on February 15, 1973. The Stockholders received the certificates evidencing the Common Stock on February 16, 1973. The certificates bore a legend to the effect that the shares represented thereby had not been registered pursuant to the Securities Act of 1933 (the "1933 Act") and could not be sold or otherwise transferred except pursuant to (i) Rule 144 of the Securities and Exchange Commission under the 1933 Act, (ii) an effective registration statement under the 1933 Act or (iii) a no-action letter from the Securities and Exchange Commission and an opinion of counsel acceptable to Rollins that the sale or transfer would be exempt from registration under the 1933 Act.

To complete the picture, the market value of the Common Stock of Rollins declined from a closing price of $34.75 per share on January 15, 1973, to a closing price of $30.13 on February 16, 1973.

The plaintiffs are four of the ten Stockholders. They filed suits against Rollins on March 18, 1976, which were consolidated by the district court pursuant to Fed.R.Civ.P. 42(a) and will be treated herein as one suit. Count I of the complaint alleged misrepresentations and omissions by Rollins in connection with the conversion of the Preferred Stock into Common Stock in violation of section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b) (1976), and Rule 10b–5 of the Securities and Exchange Commission thereunder, 17 C.F.R. § 240.10b–5 (1980). Count II alleged that Rollins was negligent in carrying out the conversion of the Preferred Stock into Common Stock. Count III alleged that Rollins had breached the Agreement in failing to make delivery of the Common Stock as therein provided. The plaintiffs sought damages measured by the difference between the market value of the Common Stock on the day they expected to receive it (approximately January 15, 1973) and the market value of the Common Stock on the day it was actually received (February 16, 1973). At the trial of the case, the district court directed a verdict for Rollins on Count I of the complaint on the ground that the evidence adduced by the plaintiffs did not present a jury question on

one or more of the requisite elements of a claim under section 10(b) and Rule 10b–5. The district court retained pendent jurisdiction over the two remaining state law claims. The jury returned a verdict upon written interrogatories in favor of Rollins on the questions of negligence and breach of contract. The district court entered judgment for Rollins on September 15, 1978, and denied a motion of the plaintiffs for a new trial on October 27, 1978.

## I. THE DIRECTED VERDICT ON COUNT I

On appeal the plaintiffs argue that the evidence did present a jury question on the issue of scienter and that the district court erred, therefore, in directing a verdict in favor of Rollins on this point. The standard of review in this circuit applicable to directed verdicts is set forth in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence–not just that evidence which supports the non–movers case–but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair–minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75 (footnote omitted).

We begin by noting that there is some disagreement between the plaintiffs, on the one hand, and Rollins, on the other hand, as to the basis for the district court's directed verdict. The plaintiffs characterized the holding as a determination that the plaintiffs' evidence did not present a jury question on the requisite element of scienter. Rollins notes correctly that its motion for a directed verdict specified a number of grounds in addition to scienter and that in considering the motion, the district court commented on the questions of materiality, reliance and scienter. We find it unnecessary to resolve the dispute over whether the decision of the district court was based on the failure to present a jury question on elements other than scienter: the transcript clearly indicates that the district court ruled that the plaintiffs failed to present a jury question on scienter and that ruling, judged under *Boeing, supra,* was correct.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that scienter is one of the elements of a cause of action under section 10(b) and Rule 10b–5 and defined scienter as follows: "a mental state embracing intent to deceive, manipulate, or defraud." *Id.* at 194 n.12, 96 S.Ct. at 1381 n.12. The Court held that negligence will not suffice for the imposition of liability under Rule 10b–5. The Court noted that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." *Id.* The Court declined, however, to address the question whether, in some circumstances, reckless behavior is sufficient for civil liability under section 10(b) and Rule 10b–5.

While this circuit's final position on whether reckless behavior is sufficient for liability under section 10(b) and Rule 10b–5

is not settled,[1] other circuits have expressly held that recklessness is a sufficiently culpable state of mind for liability under section 10(b) and Rule 10b–5. *See, e. g., Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1023 (6th Cir. 1979); *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.), *cert, denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1039–40 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977); *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir. 1977). *See also Felts v. National Account Systems Association, Inc.,* 446 F.Supp. 357 (N.D.Miss.1977) ("to establish the element of scienter in an action brought under section 10(b) and Rule 10b–5, a party must prove injury resulting from a conscious deception or from a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception"). The reckless conduct which those circuits describe, however, consists of "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Sundstrand* at 1045. The Seventh Circuit characterizes recklessness of that sort as " 'equivalent to

willful fraud'." *Id.* (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 868 (2d Cir. 1968) (Friendly, J., concurring) (en banc), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). *Hochfelder, Sundstrand* and *Felts* were called to the district judge's attention and were carefully considered by him, and his holding is specifically predicated on a recklessness standard. Assuming, without deciding, that recklessness, as defined in *Sundstrand,* will suffice as the required intent element of an action under section 10(b) and Rule 10b–5, we agree with the district court that there is no evidence of such recklessness in this record.

The two omissions of Rollins on which the plaintiffs focus are the omission to disclose to the Stockholders prior to their conversion of the Preferred Stock into Common Stock that there would be a delay until February 16, 1973, in receiving the Common Stock occasioned by the necessity for listing the Common Stock on the New York Stock Exchange and the omission to advise the Stockholders that they would be subject to the restrictions on disposition of the Common Stock imposed by Rule 144 of the Securities and Exchange Commission under the 1933 Act.[2] In order to prove that those omissions constituted violations of section 10(b) and Rule 10b–5, the plaintiffs point to a number of what they characterize as "unexplained mysteries" which they argue exemplify such reckless disregard of their

1. In *Broad v. Rockwell Int'l Corp.,* 614 F.2d 418 (5th Cir. 1980), this court held that recklessness, as defined by the Court of Appeals for the Seventh Circuit in *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1039–40 (7th Cir.), *cert. denied,* 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977), and *Sanders v. John Nuveen & Co., Inc.,* 554 F.2d 790, 793 (7th Cir. 1977), was sufficient to meet this circuit's scienter requirement. The opinion in *Broad* was vacated under Local Rule 17 on June 9, 1980, when the court granted a rehearing en banc. 618 F.2d 396 (5th Cir. 1980). *Croy v. Campbell,* 624 F.2d 709, 715–16 (5th Cir. 1980), also adopted the recklessness standard as set out in *Broad.*

2. Although the district court did not address the existence of the alleged omission to disclose the restrictions on the Common Stock imposed by Rule 144 at the same point in the trial at which the directed verdict was granted, the undisputed evidence showed that the Agreement contains, in § 8 thereof, an agreement on the part of the Stockholders not to dispose of the Common Stock except to the extent that they might be entitled to do so pursuant to Rule 154 of the Securities and Exchange Commission under the 1933 Act "or any similar such rule or regulation." Further, included in the exhibits is an agreement signed by each plaintiff to the same effect. The district court noted, and we agree, that Rule 144, *inter alia,* superseded Rule 154 during the interval between the signing of the Agreement and the conversion date. The district court further stated, and we again agree, that the plaintiffs "were certainly put on notice that this stock could have some sort of string attached to or restrain [sic] upon the free and open disposition of this stock." Tr.Vol. IV, p. 61.

rights as to establish a factual issue of scienter, variously defined in the plaintiffs' brief as conscious deception or intentional conduct. In our view, however, the record more than adequately explains all but one of the mysteries and dispels the "scienter in the air" described by the plaintiffs. The evidence is undisputed that the incorrect conversion ratio in the first redemption notice (an error which favored the Stockholders) was simply a mistake, and a corrected notice was mailed by the management of Rollins as soon as the mistake was called to its attention. The evidence is also undisputed that the original decision to defer listing the shares of Common Stock issuable upon conversion was made because the *maximum* number of shares of Common Stock to be listed could not be ascertained until the market prices of the Common Stock during the period from October 1, 1972, through November 30, 1972 (the period specified in the portion of the Agreement setting forth the formula to be used to determine the maximum number of shares of Common Stock issuable upon conversion) were ascertained. The uncontradicted testimony showed that the procedure of waiting to list the Common Stock until the *actual* number of shares of Common Stock to be issued on conversion of the Preferred Stock was known was a reasonable procedure under the circumstances.[3] Finally, the plaintiffs question the failure of Rollins to distribute to the plaintiffs the 90,000 shares of Common Stock held in the treasury of Rollins that had already been listed. Rollins quite properly notes that the 90,000 shares held in the treasury would not have been adequate to satisfy its obligation to all the Stockholders (185,783 shares were ultimately issued) and that it would have been improper to prefer the plaintiffs over the other Stockholders.

The one mystery which remains a mystery is why the Stockholders were instructed to send the certificates for the Preferred Stock to the Transfer Agent, only to have them forwarded to Rollins in Atlanta and then back to the Transfer Agent. This circuitous procedure appears to have been another mistake; in any event, the plaintiffs were unable to present any evidence of culpable recklessness equivalent to willful fraud in this connection.

In summary, the worst that can be said about the behavior of the officers and employees of Rollins responsible for effecting the conversion, based on this record, is that it was characterized, in part, by inadvertent oversights. The plaintiffs argue strongly that this behavior creates a factual issue of recklessness. We agree with the district court that this behavior does dot rise to that level and that the evidence did not present a jury question on the issue of recklessness, as that term is defined in *Sundstrand.*[4]

---

3. The record contains some testimony to the effect that the Common Stock could not have been listed until the actual number of shares to be issued was known. We note that the New York Stock Exchange, in fact, permits a security to be listed if the *maximum* number of shares to be issued (as well as the terms of the issuance and the other information required to be included in a supplemental listing application) is known. *See* New York Stock Exchange Company Manual § B3. Applied to this case, this means that when the conversion ratio was known (after November 30, 1972), Rollins could have filed a supplemental listing application covering the maximum number of shares of Common Stock issuable upon conversion, and such shares could have been listed, subject to notice of issuance and to eventual delisting of those shares not actually issued. The testimony presented by the plaintiffs did not develop that fact. Even if it had, however, on this record there is *no* evidence that the failure to list the shares of Common Stock in advance of the conversion of the Preferred Stock was anything other than an inadvertent mistake, not rising to the level of culpable recklessness, much less scienter.

4. While our decision to affirm the district court's directed verdict in favor of Rollins because of the failure of the plaintiffs to present a jury question on the element of intent makes it unnecessary to consider whether a directed verdict would also have been proper because of the plaintiffs' failure to present a jury issue on the elements of materiality and reliance, we note that our review of the record confirms that a directed verdict on those elements would also have been proper.

In *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1465, 31 L.Ed.2d 741 (1972), *the Supreme Court held that when a*

## II. THE JURY CHARGE ON COUNT III

The plaintiffs' second argument on appeal concerns the propriety of a portion of the district court's charge to the jury on

person who induces the sale of stock fails to disclose material facts that reasonably might have been expected to influence the decision to sell, a violation of Rule 10b–5 was stated. The Court went on to say that "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54, 92 S.Ct. at 1472. This circuit has construed this statement from *Affiliated Ute* to mean that "a reasonably prudent person would attach importance to the information." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 (5th Cir. 1975); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 603 (5th Cir. 1974), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). But this presumption of reliance in nondisclosure cases is not conclusive. If the defendant can prove that the plaintiff did not rely, that is, that the plaintiff's decision would not have been affected even if the defendant had disclosed the omitted facts, the plaintiff's recovery is barred. *Rifkin v. Crow*, 574 F.2d 256, 262 (5th Cir. 1978); *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974).

The evidence presented by the plaintiffs shows that the Stockholders' decision to convert the Preferred Stock rather than take the cash redemption price would not have changed even if Rollins had disclosed the alleged omitted facts–*i. e.*, that the Common Stock might be "restricted" and that a listing application for the Common Stock to be delivered on conversion had not been prepared in advance. The Stockholders had only two choices, which had to be made within twenty days after the Preferred Stock was called for redemption by Rollins: (1) surrender the Preferred Stock for $125 per share, or (2) convert the Preferred Stock into Common Stock at a ratio of 4.6449 shares of Common Stock for each share of Preferred. During the entire period from the date of the notice of redemption by Rollins until the date on which the Stockholders actually received the Common Stock, the Common Stock was selling on the market for a price substantially higher than the cash redemption price. When the Stockholders received the Common Stock on February 16, 1973, it was selling at $30.13 on the New York Stock Exchange. The market value of the Common Stock received on conversion for each share of Preferred Stock was $139.93. The redemption value of each share of Preferred Stock was $125. Obviously, a reasonably prudent person would have decided to convert his Preferred Stock into Common

Count III of the complaint alleging breach of the Agreement in connection with the delivery of the Common Stock upon conversion. The portion of the charge complained of stated:

Stock at this substantially higher value even if he had known that listing of the Common Stock would be required subsequent to the time he surrendered his Preferred Stock for conversion.

In dealing with the questions of nondisclosure and misrepresentation, the Supreme Court said in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977):

In addition to their principal argument that the complaint alleges a fraud under clauses (a) and (c) of Rule 10b–5, respondents also argue that the complaint alleges nondisclosure and misrepresentation in violation of clause (b) of the Rule. Their major contention in this respect is that the majority stockholder's failure to give the minority advance notice of the merger was a material nondisclosure, even though the Delaware short–form merger statute does not require such notice. Brief for Respondents 27. But respondents do not indicate how they might have acted differently had they had prior notice of the merger. Indeed, they accept the conclusion of both courts below that under Delaware law they could not have enjoined the merger because an appraisal proceeding is their sole remedy in the Delaware courts for any alleged unfairness in the terms of the merger. Thus, the failure to give advance notice was not a material nondisclosure within the meaning of the statute or the Rule. Cf. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 92 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

*Id.* at 474 n.14, 97 S.Ct. at 1301 n.14. Accordingly, in the instant case, the alleged nondisclosure of the time which would be required to list the Common Stock on the New York Stock Exchange was not a material nondisclosure within the meaning of section 10(b) or Rule 10b–5 because the plaintiffs would not have taken a substantially lesser amount in cash for their Preferred Stock. As such, a claim under section 10(b) and Rule 10b–5 cannot be supported. This reliance concept is incorporated into the materiality requirement under the Rule to insure that "the potentially limitless thrust of Rule 10b–5 [is restricted] to those situations in which there exists a causation in fact between the act and the injury." *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 450 F.Supp. 639, 643 (S.D.N.Y.1978), quoting *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975).

The complaint in the instant case is clearly only a claim for relief based on state law.

I charge you that under the law of this state time is not generally of the essence of a contract; but by express stipulation or reasonable construction it may become so.

In this connection, I further charge you that the nature of the [plaintiffs'] conversion privileges under the contract which it had with the defendant was that of an option contract under which, by virtue of the subject matter of the same being of a fluctuating value, time was of the essence in the delivery of the Plaintiffs' common stock. As such, the common stock was to be delivered to the Plaintiffs within a commercially reasonable time period after plaintiffs' notification to the defendant of their election to convert their preferred stock.

Tr. Vol. V, p. 131.

The plaintiffs tendered alternative requested charges, the first of which asked the jury to return a verdict in their favor under Count III if the jury determined that Rollins did not deliver the Common Stock within the essence of time once the plaintiffs had advised Rollins of their elections to convert. In the event that the district court determined as a matter of law that time was not of the essence, the plaintiffs propounded an alternative request to charge asking the jury to return a verdict in their favor if the jury determined that the Common Stock was not delivered to them within a commercially reasonable time after they notified Rollins of their elections to convert. The plaintiffs made clear to the district court that the two charges were alternatives. On appeal, the plaintiffs argue that the district judge combined the alternative charges into an instruction that is confusing and fails to provide the requisite legal guideposts to aid the jury in rationally reaching its decision.

In reviewing the district court's instruction to the jury regarding the time period within which the Common Stock was to be delivered to the Stockholders, we must consider the challenged instruction as part of the entire charge, in view of the allegations of the complaint, the evidence presented and the arguments of counsel, to determine whether the jury was misled and whether the jury understood the issues. *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1316 (5th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). If the charge in general correctly instructs, then even though a portion is technically imperfect, no harmful error is committed. *Troutman v. Southern Railway Company*, 441 F.2d 586, 590 (5th Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). However, the trial court's charge cannot stand when, as a whole, the charge leaves us with substantial and ineradicable doubt as to whether the jury has been properly guided in its deliberations. *Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 290 (5th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). In short, "[t]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *Borel v. Fiberboard Paper Products Corp.*, 493 F.2d 1076, 1100 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

The Agreement pursuant to which the Preferred Stock was originally issued and pursuant to which the Common Stock was issued upon conversion did not fix a time for performance of Rollins' obligation to deliver Common Stock upon conversion.[5] Further the Agreement did not provide that

---

5. The only provision in the Agreement which arguably deals directly with the obligation of Rollins to deliver Common Stock upon conversion of Preferred Stock is § 2C, which reads as follows:

[Rollins] is properly capitalized to carry out the exchange of stock between the parties hereto as hereinafter set forth, and [Rollins], at all times, will maintain sufficient shares of

the [Preferred Stock] and sufficient [Common Stock] to carry out the exchange and conversion of such stock among the Stockholders, as hereinafter set forth.

An obligation to "maintain" sufficient Common Stock to carry out the conversion does not, in our view, establish a time frame within which the conversion must be effected.

"time is of the essence" nor did it require that the Common Stock issuable upon conversion be delivered "immediately," "presently" or "at once." By contrast, other portions of the Agreement contain either fixed times for performance or specific methods for fixing the times for performance. For example, certain documents were to be delivered prior to the closing; a method for fixing the closing date was provided; an exchange of stock and of certain other documents was to occur on the closing date. Insofar as the terms of the Preferred Stock are concerned, a time period was fixed within which there was no redemption right or conversion privilege; the Agreement provided for thirty days' notice to the holders of the Preferred Stock of Rollins' intention to redeem the Preferred Stock; and the Agreement gave the holders of the Preferred Stock twenty days following such notice to exercise their privilege of conversion. Since there were exact dates or fixed time periods in the Agreement for most of the acts to be performed thereunder, including the exchange of shares at the original closing, it may be presumed that the Agreement would have provided for the Common Stock to be delivered to the holders of the Preferred Stock upon conversion "presently," "immediately," "now," "at once" or within a fixed time period if the parties had so intended. See Ga.Code Ann. § 20–704(4) (1977). Accordingly, the only implication which can be drawn from the Agreement, considered as a whole, was that immediate or instantaneous performance of the obligation to deliver the Common Stock upon conversion of the Preferred Stock was not intended.

■■■ Since the Agreement did not fix a time for performance of Rollins' obligation to deliver the Common Stock, either explicitly or by necessary implication, it should be construed as allowing a reasonable time for that purpose, and what is a reasonable time is a matter of fact to be determined by the jury under all the circumstances of the case. *Berman v. Berman*, 239 Ga. 443, 238 S.E.2d

27 (1977); *Whitley v. Patrick*, 226 Ga. 87, 172 S.E.2d 692 (1970); *Bearden Mercantile Co. v. Madison Oil Co.*, 128 Ga. 695, 58 S.E. 200 (1907); *Christie v. Hogan–Scarboro Corp.*, 134 Ga.App. 151, 213 S.E.2d 533 (1975); *Trailmobile Division of Pullman, Inc. v. Jones*, 118 Ga.App. 472, 164 S.E.2d 346 (1968); Ga.Code Ann. § 20–1101 (1977). The district court was correct in calling to the jury's attention in the charge the fact that the subject matter of the Agreement (Common Stock) had a fluctuating value, which in turn has a bearing on what is a reasonable time under the circumstances. Thus, in *Ferguson v. Bank of Dawson*, 57 Ga.App. 639, 196 S.E. 195 (1938), which was an action on a note given for the purchase price of stock, the court held that under a contract of sale which provides no specific time for performance a reasonable time is to be allowed, which determination is to be made by a jury under the circumstances attending the transaction, but that a tender of stock made 6½ months after the sale was after the lapse of a reasonable time as a matter of law.

■■■ We think that the charge, as a whole, fairly read, properly instructs the jury that the relevant time period is a commercially reasonable time period, and that in determining what is commercially reasonable, the jury should take into account the fluctuating value of the Common Stock. We agree with the district court, in its order denying plaintiffs' request for a new trial, that the "time was of the essence" language was surplusage, but that the resulting instruction was not confusing and accurately defined the issue to be determined by the jury. A substantial amount of expert testimony was adduced by Rollins which showed that a normal time for delivery of Common Stock upon conversion of Preferred Stock in view of the circumstances of this case (involving a nonresident Transfer Agent) would have been six weeks. Considering the charge as a whole, in the light of the evidence presented, the charge gave proper guidance to the jury.[6]

---

**6.** If we concede, for purposes of argument, that the Agreement requires performance "immedi-

ately," rather than within a "commercially reasonable time," several Georgia cases arising in

Our conclusion that the jury was correctly charged on the matter of the time for performance makes it unnecessary for us to consider whether the allegedly improper charge on Count III could have infected the jury's findings on Count II.

In summary, we hold that the directed verdict in favor of Rollins on Count I was proper and that the charge to the jury on Count III, considered as a whole, correctly instructed the jury as to the issue of the time for performance.

AFFIRMED.

a variety of contexts suggest that immediate delivery means performance with reasonable diligence concerning the circumstances. *See Studdard v. Hawkins*, 139 Ga. 743, 746, 78 S.E. 116, 118 (1913) ("But in both decisions care was taken to state that the word 'presently' or its synonyms should be given a reasonable and substantial construction, in view of the thing to be done, and not to be considered as equivalent to instanter"); *Woodall v. Fidelity & Casualty Co.*, 131 Ga. 517, 518–19, 62 S.E. 808, 809 (1908) ("the requirement in the policy that immediate written notice must be given the company at New York City, of any disease or illness for which a claim is to be made, is of the essence of the contract and must be complied with before any recovery can be had. [citations omitted]. The requirement that immediate notice be given must be held to mean that notice must be given within a reasonable time after the insured became afflicted with the disease from which the disability resulted, and the question here involved is whether or not the notice was given the company in such time"). *See also Roberson v. Weaver*, 145 Ga. 626, 89 S.E. 769 (1916); *Bituminous Corp. v. J. B. Forrest & Sons, Inc.*, 132 Ga.App. 714, 719, 209 S.E.2d 6, 9 (1974) (" 'Immediately' has been construed in many cases to mean within reasonable diligence and within a reasonable length of time in view of attending circumstances of each particular case"); *Buchanan v. Huson*, 39 Ga.App. 734, 148 S.E. 345 (1929); *Central of Georgia Railway v. Griner & Rustin*, 33 Ga.App. 705, 127 S.E. 878 (1925); *Columbia Smelting & Refining Works v. Dexter & Wright*, 31 Ga.App. 627, 121 S.E. 844 (1924); *Georgia Agricultural Works v. Price*, 11 Ga. App. 80, 74 S.E. 718 (1913).