994 F.2d 1390
 Fed. Sec. L. Rep. P 97,460, 25 Fed.R.Serv.3d 1467
 ARTHUR CHILDREN'S TRUST, et al., Plaintiff-Appellant,
v.
Howard E. KEIM and Jo Ann Keim, Defendants-Appellees,
and
Independent Trust Company, Defendant. (Two Cases)
ARTHUR CHILDREN'S TRUST, et al., Plaintiff-Appellant,
v.
Richard GODFREY, Defendant-Appellee,
and
Independent Trust Company, Defendant.
 Nos. 91-16509, 91-16693, 92-16203.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1993.
Decided June 1, 1993.
 
 Russell Piccoli, Phoenix, AZ, for plaintiff-appellant Arthur Children's Trust.
 Daryl Manhart and Edwin D. Fleming, Burch & Cracchiolo, Phoenix, AZ, for defendants-appellees Howard and Jo Ann Keim.
 David R. Schwartz, Udall, Shumway, Blackhurst, Allen & Lyons, Mesa, AZ, for defendants-appellees Richard and Golda Faye Godfrey.
 Appeal from the United States District Court for the District of Arizona, C.A. Muecke, District Judge, Presiding.
 Before: FLETCHER, REINHARDT and NOONAN, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 In these consolidated appeals Arthur Children's Trust et al. (the Investors) appeal summary judgments in favor of Howard Keim (Keim) and his wife, JoAnn, and in favor of Richard Godfrey (Godfrey) and his wife, Golda Faye. Russell Piccoli (Piccoli), Arthur Children's Trust's attorney, appeals the award of Rule 11 sanctions against himself. The underlying action against Keim is for securities fraud in violation of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq., and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1980). He is alleged to have been a control person as defined by 15 U.S.C. § 78t of an issuer of fraudulent securities. Godfrey is alleged to have abetted the securities fraud and to be liable for negligent misrepresentations as to two appraisals benefitting the issuer of the securities. We reverse the summary judgment in favor of Keim and the award of sanctions against Piccoli and remand. We affirm the summary judgment in favor of Godfrey.
 
 FACTS
 
 2
 In January 1985 an agreement for a joint venture called Los Caballos Development Associates (the Venture) was entered into by Los Caballos de Santa Fe, Inc., a New Mexico corporation (the Santa Fe Company) and Parkland Development Corporation, an Arizona corporation (Parkland). The agreement provided that the Santa Fe Company would "initially contribute" certain real estate and services to the Venture "in the form of administrative and development expertise" and that Parkland would "initially contribute" certain real estate and services "in the form of administrative, and financing and development expertise." A Management Committee was created whose duties were stated in the agreement as follows:
 
 
 3
 Except as expressly provided herein, neither of the Venturers shall have the authority to act for the other Venturer, but instead the management of the business affairs of the Venture shall be vested in a Management Committee ... Any major or significant business decisions affecting the Venture shall be made by the Management Committee, including, but not limited to ... incurring of any obligation on behalf of the Venture in excess of Twenty Thousand Dollars ($20,000), the employment of professionals and other employees, and any other decision which may materially affect the Venture.
 
 
 4
 A special section of the agreement, entitled "Additional Funds," provided:
 
 
 5
 If in the judgment of the Management Committee additional funds are required for the Venture's operations and purposes from time to time, and if the Management Committee determines that the funds are not to be borrowed, then the additional funds required shall be contributed by the Venturers fifty percent (50%) each upon ten (10) days' advanced notice, and shall be treated as additional capital contributions to the Venture.
 
 
 6
 The Management Committee was to consist of eight members, with each venturer nominating four and Parkland having the right to designate the chairman, whose vote in case of a tie would be decisive and who was to be responsible for "the day-to-day business decisions and operations." Parkland nominated John Hill, Michael Smith, Timothy Sprague and Larry LaPrade, with LaPrade designated as chairman. The Santa Fe company nominated its chairman, Burton Melton; its president, Don Burt; and two of its directors, Mark Conkling and Keim.
 
 
 7
 The purpose of the Venture was a real estate development south of Santa Fe which, when completed, would include private residences, retail shops, a hotel and--as a centerpiece--a stadium and accompanying facilities to constitute a major equestrian convention center--hence the project's appealing name, "The Horses," in Spanish.
 
 
 8
 LaPrade and Smith began the task of money-raising, using as a vehicle Incor, a corporation controlled by them. As a result of Incor's solicitation the Investors, mostly pension plans for doctors, were led to purchase the Venture's notes. All the representations made to the Investors were made by Incor, LaPrade or Smith. The Venture put no restrictions on their methods. No representations to the Investors were made by Keim.
 
 
 9
 On March 1, 1985 the Venture issued a promissory note for $3,760,000 payable to the holders listed on Exhibit A attached to the note. A number of the Investors were listed on Exhibit A. The interest was 16 percent on the unpaid principal balance beginning April 1, 1985, with a balloon payment of the entire unpaid principal balance plus all unpaid interest due 12 months from the date of the note. The note was secured by a second mortgage by the Venture on its real estate in Santa Fe. The mortgage and the note were executed by the Venture with the signatures of Los Caballos de Santa Fe, Inc., joint venturer, by Peter C. Webb, its secretary-treasurer, and Parkland Development Corporation, joint venturer, by Michael Smith, its treasurer.
 
 
 10
 Soon after this financing had been accomplished, the Venture was in difficult straits. According to a memorandum of July 3, 1985 from Peter Webb, controller of the Santa Fe company, to the members of the Management Committee of the Venture, including Keim, the committee on June 17, 1985 discussed the "precarious situation regarding our financial capabilities to meet our obligations to the Incor investors and our other contractual obligations." The Venture's current deposits were "adequate to cover our Incor interest obligations," but if "we continue to pay our development obligations we could be out of money as soon as October." Michael Smith had stated that if construction financing were not in place by October he "would address the problem." In light of this statement, "it was agreed" that Webb "should continue to pay our obligations as they are incurred or due using all available funds including those previously earmarked for interest payments to Incor's investors."
 
 
 11
 According to the minutes of the Management Committee for July 10, 1985, at which Keim was present, a large number of topics were discussed. Among other things:
 
 
 12
 Larry LaPrade emphasized the profit portion of Sheet 16 [of the Financial Package]. The lenders are interested in hard numbers, and the profit that will be generated.
 
 
 13
 Financing package was discussed. Sprague stated that we had to raise from three to five million dollars worth of equity. He suggested to the Management Committee that they should begin putting names, addresses of potential investors. He said that there were tax considerations to think of, perhaps potential pension fund money. Three and one half million dollars raised by ourselves, the rest banks. Great tax shelters for prospective investors. Keim felt tax benefits would be there. Pension Plan money is easier to tap.
 
 
 14
 Following a discussion of "the appraisal," Larry LaPrade raised the possibility of a bridge loan, "starting in August." Keim said "he was prepared to give all out whatever it takes. Pension Plan 15%."
 
 
 15
 In addition to being a member of the Management Committee of the Venture, Keim was chairman of its Development Committee. He had a 10 percent equity interest in the enterprise. He was also owed a $100,000 "development fee" by the Santa Fe company, a fee which he asserted in a letter to Larry LaPrade of November 27, 1985 had been assumed by LaPrade, apparently meaning that the Venture had assumed it. A budget of the Venture reflects only one fee for development--$100,000 owed Keim.
 
 
 16
 According to the affidavit of Timothy Sprague:
 
 
 17
 [V]arious discussions were had between members of the management committee, including Howard Keim, with respect to the raising of seed capital for the project. As time progressed throughout 1985, the project having continued to incur significant development expenses and no construction or permanent financing having been obtained for the project, these discussions among the members of the management committee included "rolling over" previous loans secured for the project by Michael Smith and Larry LaPrade, together with the raising of new monies through additional loans.
 
 
 18
 Mr. Keim--who was constantly pressing the venture for payment of his own fees--was generally an advocate of Smith and LaPrade's lending activities, his comments essentially being to get it done.
 
 
 19
 Sprague further swore that at the July 1985 meeting or prior thereto, Smith advised the members of the Management Committee that "he was borrowing monies for the project from doctor pension plans by offering to secure their loans by the project's real property, on a 50% loan to value ratio. Previously, at the time of the original loan, it was discussed that it would also be secured by the personal guarantees of all the Los Caballos venturers, excluding defendant Keim, who I understand refused to provide one." On a flight from Albuquerque to Phoenix in July 1985 Sprague also described to Keim "Smith and LaPrade's manner of raising funds."
 
 
 20
 On March 1, 1986 the Venture again executed a promissory note, secured by a mortgage on its real estate, in the amount of $5,400,000. The note and mortgage were issued to the Independent Trust Corporation as trustee for the beneficiaries listed on Exhibit A attached thereto. Certain of the Investors were among the beneficiaries. The interest was 16 percent on the unpaid principal balance, due beginning April 1, 1986, "with a balloon payment of the entire unpaid principal plus all unpaid interest due and payable six months from the date of receipt of invested funds." The note and mortgage were executed by the same entities and persons as the note and mortgage of March 1, 1985. The proceeds of this issue were used to repay the 1985 note.
 
 
 21
 All of the foregoing facts are not disputed, with one large exception. According to Keim's deposition, he had no knowledge of how LaPrade and Smith were raising the money and no knowledge of who was providing it.
 
 
 22
 The Venture was a financial disaster. LaPrade and Smith entered bankruptcy. The Investors lost their money.
 
 PROCEEDINGS
 
 23
 On December 21, 1988 the Investors filed suit under the Securities Exchange Act of 1934 against six of the members of the Management Committee, including Keim, and against several others associated with the enterprise, including Godfrey. The third claim for relief asserted that the defendants who had been members of the Management Committee of the Venture were controlling persons in the sense that section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), defines "controlling persons." They were alleged to have known the dire financial straits of the Venture and, knowing it, to have also known that no one would have invested in it unless provided incentives which no defendant had reason to believe were being promised or unless there were false representations. In this situation, knowing that millions of dollars were being raised for their project from private investors, the control persons allegedly undertook no action to implement controls on LaPrade, Smith and Sprague; they allegedly exercised no "internal control or supervision" to prevent violation of the securities law; they allegedly either did not inquire as to the representations made to induce the loans or knew that the loans were induced by fraudulent representations.
 
 
 24
 After discovery had been conducted both in the LaPrade and Smith bankruptcies and in this case, Keim on January 21, 1991 moved for summary judgment. Piccoli, on behalf of the Investors, filed a response on March 4, 1991. Included with it was an unsigned affidavit of Mark Conkling, which was relied on in the response. Also included was an affidavit of Piccoli, submitted "pursuant to Fed.R.Civ.P. 56(f)," stating that he had interviewed Conkling on July 31, 1989 and memorialized Conkling's answers and sent him a draft affidavit reflecting them. Conkling had not responded. When Keim moved for summary judgment, Piccoli asked Conkling to sign the draft. Conkling refused, and also rejected a second draft which Piccoli sent him. The second draft, unsigned, was what Piccoli now submitted, noting that Conkling said it was "inaccurate," but stating that in Piccoli's belief it was "true and accurate." Piccoli noted that he was in New York preparing for trial as he faxed to Arizona his own affidavit to the district court.
 
 
 25
 With the response to Keim's motion for summary judgment, the Investors also filed a cross-motion for summary judgment. No documents were attached to it. Later in the month of March 1991, Keim filed a reply in support of his motion for summary judgment, and the Investors filed a reply in support of their cross-motion, attaching to it two supporting affidavits of Sprague. On May 3, 1991, the Investors filed a "schedule of factual contentions." Among these contentions was that the Venture was the issuer of the two notes alleged to be fraudulent.
 
 
 26
 On May 30, 1991, the district court found that Keim had no control over the financing and was therefore not a control person. Moreover, the court found "nothing to indicate that Keim knew anything about 'false representations.' Therefore, he is not liable as a controlling person." The court did not discuss the Venture's role as issuer of the notes. The court granted Keim's motion for summary judgment and denied the Investors' cross-motion.
 
 
 27
 The Investors moved to alter or vacate the judgment. Their motion was denied. The district court proceeded to hold a hearing on whether it should sanction Piccoli under Fed.R.Civ.P. 11. On September 21, 1991 the court found that Piccoli, in submitting the Conkling affidavit, had submitted a false, unsigned affidavit and did so although he could have moved for more time to conduct discovery. The court also held that Piccoli's summary of Keim's deposition was incorrect. The use of the unsigned affidavit and the summary was stamped by the court as an attempt "to manufacture facts" warranting Rule 11 sanctions. The court also concluded that Piccoli had not made reasonable inquiry, as required by Rule 11, before filing his opposition to Keim's motion for summary judgment. According to the court, Piccoli "knew at that time that he could not establish control person liability against Keim." Rule 11 sanctions were, in the court's view, appropriate for the failure of Piccoli at this point to concede his case. Finally, the court concluded that Piccoli should pay personally for the expense he had inflicted on Keim by opposing Keim's summary judgment motion because Piccoli had violated 28 U.S.C. § 1927, making personally liable any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously." The court awarded attorney's fees of $24,000 against Piccoli and directed that Piccoli's conduct be brought to the attention of the State Bar of Arizona.
 
 
 28
 The Investors and Piccoli appeal.
 
 ANALYSIS
 The Case Against Keim
 
 29
 The Issuer. The notes and mortgages given to the Investors by the Venture in 1985 and 1986 were investment contracts constituting securities under the Securities Act of 1933, 15 U.S.C. § 77b(1) (Supp.1992). SEC v. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946); Safeway Portland Employees' Fed. Credit Union v. C.H. Wagner & Co., 501 F.2d 1120, 1123 (9th Cir.1974). Accordingly, the Venture was an issuer under the statute. 15 U.S.C. § 77b(4) (1981).
 
 
 30
 The Issuer's Scienter. If the representations made by LaPrade were false, the issuer had the scienter that Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) requires for Rule 10b-5 liability. Id. at 212-14, 96 S.Ct. at 1390-91. The issuer is chargeable with the knowledge of LaPrade, the head of its Management Committee, acting to market the issuer's securities. That LaPrade acted through Incor cannot insulate the issuer from his knowledge. The issuer is equally possessed of scienter if the providing of the appraisal reports to Incor for fund-raising is found to have been the providing of information not fraudulently but recklessly. Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). Such recklessness would be established by showing that knowing of Incor's fund-raising, the issuer provided the reports to be read by laypersons in " 'an extreme departure from the standards of ordinary care' " and with the danger of misleading the purchasers of the securities " 'so obvious' " that the issuer must have been aware of it. Id. (quoting Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977).
 
 
 31
 The Controlling Persons of the Issuer. In general, the determination of who is a controlling person for purposes of liability under 15 U.S.C. § 78t is an intensely factual question. See 4 Louis Loss & Joel Seligman, Securities Regulation 1724 (1990). A director is not automatically liable as a controlling person. Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir.1984) (a director who was uninvolved in the company's day-to-day cattle business and was without experience in the business and had nothing to do with the prospectuses issued to the doctor investors was not a controlling person, nor was a director who had minimal interaction with the company, due partly to ill health). Citing Burgess, Loss and Seligman observe: "Accordingly, although a person's being an officer or director does not create any presumption of control, it is a sort of red light." 4 Loss & Seligman, supra, at 1724 (emphasis in original). It is not uncommon for control "to rest with a group of persons, such as the members of the corporation's management." Id. at 1722.
 
 
 32
 Here the persons controlling the issuer in every material respect were the Management Committee, whose decisions, as the Joint Venture Agreement specifies, were "binding on the Venturers." The "major or significant business decisions affecting the Venture" were to be made by the Management Committee. Every decision which might "materially affect the Venture" was the Management Committee's to make. A line was drawn by the agreement between decisions of this kind which were confided to the committee and "day-to-day business decisions and operations."
 
 
 33
 The terms and representations on which the Venture's financing were obtained were not a day-to-day affair. They were "major" or "significant." They materially affected the Venture. They had to be determined by the Management Committee.
 
 
 34
 In the words of the agreement, Parkland was "initially" to contribute "administrative, and financing and development expertise." The agreement did not specify that this obligation of Parkland was to continue beyond the beginning of the Venture. In particular, the raising of additional funds was expressly left to "the judgment of the Management Committee" which was to determine whether "additional funds are required for the Venture's operations and purposes from time to time." It was further expressly provided in the agreement that neither of the Venturers had "the authority to act for the other Venturer," so Parkland had no authority to raise money by itself. As the agreement puts it, "instead the management of the business affairs of the Venture shall be vested in a Management Committee." The members of this committee were "a narrowly defined group" charged with the task of making these decisions, hence "it is reasonable to presume that [they] had the power to control." Wool v. Tandem Computers Inc., 818 F.2d 1433, 1441 (9th Cir.1987).
 
 
 35
 Webb's memorandum of July 3, 1985 shows that the Management Committee on June 17, 1985 specifically discussed the "precarious situation regarding our financial capabilities to meet our obligations to the Incor investors." According to that memorandum, the members of the Management Committee, including Keim, were informed that the Venture would run out of money as soon as October 1985. The Management Committee then decided to use for current obligations funds "previously earmarked for interest payments to Incor's investors."
 
 
 36
 According to the minutes of the Management Committee for July 10, 1985, which Keim attended, there was explicit discussion of the "financing package"--necessarily a reference to the package to be put together by Incor, the company doing the financing. Sheet 16 of that package, dealing with the residential property of the project, was discussed in terms of expected profits. The amount to be raised was discussed. Keim specifically addressed the tapping of pension plan money. Keim also took the lead in stating what rate of interest should be paid.
 
 
 37
 Webb's memorandum of the June 17, 1985 meeting and the minutes of the meeting of July 10, 1985 show the Management Committee acting by consensus, not by vote. The committee does not appear to have been dominated by LaPrade or by the Parkland members as a whole. Keim appears as a vocal and active participant in the management of the Venture.
 
 
 38
 Keim states that in fact he had no control over LaPrade, Smith and Incor and argues that this undisputed fact should relieve him of liability as a controlling person. Keim misunderstands the basis on which his liability is alleged. He is sued not because he controlled those marketing the investment contracts but because he was one of the persons controlling the issuer of the investment contracts.
 
 
 39
 The Controlling Person's Scienter. To establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter. If the plaintiff had this obligation, the controlling person provision "would hardly make anyone liable who would not be so otherwise." G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 960 (5th Cir.1981). But a defendant who is a controlling person of an issuer with scienter has the burden of proving his absence of scienter. Hollinger, 914 F.2d at 1575; Partridge, 636 F.2d at 960. Under the controlling person statute that means that Keim, as a person controlling the issuer, was subject to liability unless he establishes that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a) (1981).
 
 
 40
 Some of our earlier cases took the position that in proving the liability of a controlling person, the plaintiff has the burden of showing that the defendant does not come within the good faith exception. E.g., Christoffel v. E.F. Hutton & Co., 588 F.2d 665, 668-69 (9th Cir.1978). But it has now been established that this burden falls upon the controlling person. Hollinger, 914 F.2d at 1575. Although Hollinger is specifically directed to a broker-dealer in relation to its registered securities salesman, id. at 1575 n. 24, we have extended the holding beyond this context. See San Mateo County Transit Dist. v. DeArman, Fitzgerald and Roberts, Inc., 979 F.2d 1356 (9th Cir.1992). There is no reason to construe the statute as though it were restricted only to broker-dealers and their salespersons. Congress was well aware of the special duties owed by a broker-dealer and could have put the rules on control person liability solely in that context if it so desired. See e.g., 15 U.S.C. §§ 78k and 78o. Congress did not act in this restricted way. Those controlling an issuer of securities are liable for the conduct of the issuer and so are liable if an issuer intentionally or recklessly permitted the fraudulent marketing of its securities.
 
 
 41
 Consequently, Keim has the burden of proving his good faith. His own declaration of innocence does not meet that burden when the Investors have offered evidence disputing his ignorance of the financing; when Webb's memo of July 3, 1985 shows Keim was aware that Incor had recruited the Investors and that the interest payments to them were in jeopardy; when the minutes of the Management Committee for July 10, 1985 show him as a participant in the discussion of financing; when his letter to LaPrade of November 27, 1985 and the affidavit of Sprague show him pressing for his $100,000 developer's fee; when Sprague's affidavit shows him influential enough to avoid giving the personal guarantee extracted from the others; when Sprague has deposed that Keim was told that the loans from the Investors were to be secured on the basis that they would be half the value of the property; and when his responsibilities as a member of the Management Committee necessarily made him familiar with the cash needs and cash resources of the Venture. In the face of these proffered facts, Keim's alleged good faith and his not having directly or indirectly induced the allegedly fraudulent marketing of the Venture's notes could not be determined by summary judgment. Accordingly, summary judgment in his favor is reversed.
 
 
 42
 The Sanctions Imposed on Piccoli. Rule 11 of the Federal Rules of Civil Procedure requires a district court to impose sanctions upon any person signing a pleading, motion, or other paper if it is either frivolous or filed for an improper purpose. Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1365 (9th Cir.1990) (en banc). The imposition of sanctions is reviewed for abuse of discretion. Id. at 1365-66. "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). In granting Keim's motion for summary judgment and imposing sanctions upon Piccoli the district court failed to consider the argument advanced by Investors that Keim could be liable by virtue of his control over the Venture. We have held that Keim's control over the Venture precludes summary judgment in his favor. Piccoli's opposition to the motion was not frivolous. The district court's decision to impose sanctions for opposing summary judgment was based upon an erroneous view of the law and must be reversed as an abuse of discretion. Because the motion for summary judgment was properly opposed, Piccoli did not "unreasonably and vexatiously" multiply the proceedings. 28 U.S.C. § 1927 (Supp.1992). The award of costs in favor of Keim under § 1927 also was an abuse of discretion.
 
 
 43
 The district court further found sanctions appropriate under Rule 11 because Piccoli relied upon an unsigned affidavit in the Investors' response to Keim's motion for summary judgment. The district court correctly noted that relying on a false or misleading affidavit in responding to a summary judgment motion is an "improper purpose" under Rule 11. However, Piccoli did attach his own affidavit which explained that Conkling had rejected the unsigned affidavit as inaccurate and that the references to it in the motion papers were inserted before Piccoli knew of Conkling's refusal. Although he should have filed a formal motion for additional discovery time, Piccoli faced serious time and distance constraints. Under the circumstances, Piccoli's manner of handling the Conkling affidavit was not unreasonable enough to justify the imposition of sanctions. Nor were sanctions warranted, as the district court found, for inaccurate deposition summation. Piccoli's synopsis of Keim's deposition was argumentative but not false.
 
 
 44
 Before the summary judgment motion was heard, Piccoli supplied the Sprague affidavits that gave substance to the Investor's case. The sanctions were measured by the district court in terms of the expense Keim was put to in successfully moving for summary judgment over Piccoli's opposition. As Piccoli properly opposed the motion, we vacate the monetary award against Piccoli.
 
 The Case Against Godfrey
 
 45
 In connection with its fund-raising and the issue of the 1986 note, the Venture obtained an appraisal of its properties. The appraiser, Harvey H. Cornell, by letter dated September 6, 1985, transmitted the appraisal by letter to the Venture, stating:
 
 
 46
 Pursuant to a request from the officers of Los Caballos Development Associates, Inc., we have prepared a market value estimate for the above listed properties. The appraiser assumes the equestrian facility to be complete turn key as described in the appraisal.
 
 
 47
 The effective date of appraisal is July 31, 1985.
 
 
 48
 On the basis of our studies the estimated value of subject properties is:
 
 
 49
 Section I--Equestrian Center and Land Thirteen Million Dollars $13,000,000.00
 
 
 50
 Section II--Vacant Residential Lots (Sheet 16) One Million Seven Hundred Thousand $1,700,000.00
 
 
 51
 The basis for these conclusions may be found in the attached report of 34 pages.
 
 
 52
 Cornell signed this letter. Underneath his signature appears: "Reviewed by Richard G. Godfrey, M.A.I."
 
 
 53
 The following page, entitled "Cornell Appraisal," states "Assumptions and Certifications." Nothing on this page indicates any assumption about the existence or non-existence of the equestrian center. The next page, appearing on Godfrey's stationery, states that he did not inspect the properties or independently verify or analyze the data. He concludes: "Based on data and analyses presented in the reports, and assumptions and limited conditions included therein, I believe the conclusions on residential Lots 15 and 16 as well as the commercial lands described are reasonable as of August 31, 1985."
 
 
 54
 The Investors sued Godfrey for aiding and abetting the alleged fraud of Keim and for negligent misrepresentation. Godfrey moved for summary judgment. The Investors conceded that they could not prove that Godfrey had aided and abetted securities fraud. They opposed his motion for summary judgment on the state claim of negligent misrepresentation.
 
 
 55
 On May 30, 1991, the district court granted Godfrey's motion. It found that the information in the appraisal reports was not false because the "undisputed facts established that the reports were prepared with the assumption that the equestrian center would be, but was not yet, completed" and "this fact was spelled out in the appraisal reports and cover letters accompanying the appraisals." In addition, the court found that Godfrey had no duty to the Investors.
 
 
 56
 Godfrey's Liability.
 
 
 57
 Arizona has adopted the Restatement of Torts, § 552, whose title is "Information Negligently Supplied For The Guidance of Others." As the first Arizona case to apply this provision observed, the Restatement originally stated the liability in terms of one who negligently "in the course of his business or profession supplies information," but revision inserted the term "false" between "supplies" and "information." Arizona Title Ins. and Trust Co. v. O'Malley Lumber Co., 14 Ariz.App. 486, 484 P.2d 639, 644 (1971); Restatement (Second) of Torts § 552. The duty established by the Restatement is a duty not to make a misrepresentation, a duty "not to misstate existing, ascertainable facts." O'Malley Lumber, 484 P.2d at 646. Explicitly adopting the Restatement (Second) and citing O'Malley Lumber with approval, the Arizona Supreme Court laid down the rule as governing one who "supplies false information for the guidance of others in their business transactions." St. Joseph's Hosp. v. Reserve Life Ins. Co., 154 Ariz. 307, 742 P.2d 808, 813 (1987).
 
 
 58
 In the appraisal material certified by Godfrey relative to the land on which the equestrian center was to be built, the Summary of Salient Facts and Conclusions states the purpose of the appraisal to be "market value cash or cash equivalent as developed." In the following paragraph "Land Size" is stated as "82.37 acres of potential commercial land." "Potential" is clearly not actual. Later in the report "the proposed equestrian center" is referred to and the 82.37 acres "underlying" it are described as "vacant land." There are further references to the proposed state of the land which would alert any lender that nothing was now built.
 
 
 59
 The district court understood the Investors' case to be that Godfrey had implied that the equestrian center was completed. The district court found that such an implication was not made by Godfrey or by the appraisals he certified. Now, on appeal, the Investors in their Reply Brief explicitly disavow "that such misrepresentation was the basis of this action. The Investors never contended that the deficiency in the appraisals was that they implied or asserted that the center had already been built."
 
 
 60
 The Investors say that their case now and "throughout" has been "that four out of five sections of the appraisal--the sections involving over 2,000 acres--failed to disclose that the values given were predicated on completion of the center." (Emphasis added). This phrasing of the Investors' position fails for two reasons: First, the Sheet 16, July 31, 1985 appraisal of the residential lots speaks of "Proposed Development" and gives a "Final Value Estimate" of the property "as developed." The August 31, 1985 appraisal of Lots 15 and 16 gives the "Retail Value" "as if fully developed and subdivided" and the "Introduction" refers to estimating the value of the property "as it will be developed into salable residential lots." The August 31, 1985 appraisal of Lots 4-12 describes what is being valued as "vacant commercial site at the Santa Fe Ranch" and gives the "Retail Value" "as if fully developed and ready for immediate sale and improvement." No reasonable person reading these reports would have understood that they were current valuations of "raw land," as now argued by the Investors; they were estimates of land as developed.
 
 
 61
 Second, as the Investors now concede that the appraisal of the equestrian center made clear that it was as yet unbuilt, and as this appraisal was attached to the other appraisals circulated by Incor, no reasonable reader of these appraisals could have believed that the land was being currently valued as if the equestrian center was in place.
 
 
 62
 Summary judgment was properly granted in Godfrey's favor.
 
 
 63
 AFFIRMED as to Godfrey. REVERSED as to Piccoli. REVERSED and REMANDED as to Keim.